625 So.2d 243 (1993)
Walid R. ALAYWAN, Plaintiff-Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, et al., Defendants-Appellees.
No. 24812-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1993.
*244 Lamothe, Hamilton & Odom by Frank E. Lamothe, III, New Orleans, Marshall Blackwell, Monroe, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh by David H. Nelson, Monroe, for defendants-appellees.
Before MARVIN, C.J., and SEXTON, NORRIS, LINDSAY and VICTORY, JJ.
VICTORY, Judge.
In this appeal, two of the three judges of the original appellate panel proposed to amend in part the lower court judgment. A dissent by the third judge provoked a five-judge appellate panel as required by LSA-Const. Art. 5, § 8 B.
Walid R. Alaywan sued for personal injuries and other damages allegedly sustained when his moped was struck by a car driven by Patricia Love and insured by Northern Assurance Company. After a four-day jury trial, the jury found Ms. Love negligent in causing the accident and cleared Mr. Alaywan of fault; it awarded him $8,828.29 in special damages and $13,671.71 for physical pain and suffering and mental anguish, but rejected his claims for lost earnings, lost earning capacity and permanent disability. The trial court entered judgment for the total, $22,500.00, and Mr. Alaywan now appeals. For the reasons expressed, we find the jury was not clearly wrong to reject the claims for lost earnings and earning capacity, for permanent physical and mental disability, and for additional medical expenses. Further, the jury did not abuse its discretion in awarding $13,671.71 for the pain, suffering and mental anguish arising from this accident. Therefore, we affirm the lower court judgment.

FACTUAL BACKGROUND
When the accident occurred in August 1988, Alaywan was a 31-year-old Lebanese citizen who had been attending Louisiana Tech in Ruston for several years; he was in the Ph.D. program in civil engineering. On the afternoon of August 15, he was riding at about 15 mph on his moped north on Cookstown Road near its intersection with Western Avenue. He was wearing his helmet. Meanwhile, Ms. Love was driving her father's 1985 Corvette east on Western Avenue. When she reached the stop sign at Cookstown Road, she either ran it or stopped and proceeded before Alaywan could clear the intersection in which he was favored. Ms. Love ran into his moped. On impact Alaywan was hurled from the seat of the moped and thrown over the hood and top of the Corvette. He landed on the pavement some distance behind the car.
According to Alaywan, he was not knocked unconscious, either by impact with the Corvette or with the pavement; however, "everything went quiet" and he was momentarily stunned and disoriented. He tried to take a deep breath but felt his chest was "crushed." He hobbled to the curb and sat down until an ambulance came.
Alaywan was taken to the emergency room at Lincoln General Hospital and treated there by Dr. George Byram, a general practitioner. At first his chief complaint was severe *245 chest pain. The x-rays showed that the tip of plaintiff's right tenth rib was possibly fractured, and he was given a rib belt. Dr. Byram noted numerous cuts and abrasions on Alaywan's body. Alaywan also complained about his right ankle; Dr. Byram found a sprain and sent him home on crutches. Alaywan did not complain about head pain, or that he had been struck in the head; however, he testified that he was hurting all over. He testified that after he left the hospital, he spent a few days at his apartment, suffering with nausea, vomiting and headaches.
Two days after the accident, Alaywan went to his family doctor, Dr. Allen J. Herbert, who noted cuts on his left elbow and right leg, the possibly cracked rib as shown by the hospital x-rays, and diffuse tenderness. Because Alaywan said he was in great pain, Dr. Herbert admitted him to Lincoln General for two days of observation. Dr. Herbert placed him on anti-inflammatory drugs and sent him to a physical therapist, while still treating him. Alaywan described the next few months as a period in which one problem would subside, but another would "pop up" to take its place.
Early in his recovery, Alaywan's medicine gave him nausea; Dr. Herbert had to prescribe an antacid. In early September, Alaywan complained his chest was still very painful and that he was irritable and depressed, with some loss of appetite. He also complained of a loss of strength in his left thumb. However, a large bruise around his left knee was resolving, and pain there and in the elbow was becoming more localized. Apparently off the crutches, Alaywan complained that his right ankle "popped" when he walked on it. In late November, Alaywan lodged his first complaint to Dr. Herbert about pain in his neck and back.
The physical therapist, David Johnson, saw Alaywan several times between late August 1988 and early January 1989. His treatment consisted of moist heat for the pains in the legs and ankle, and diathermy for the pain in the chest. Apparently Alaywan reported shoulder pain to the therapist sooner than he did to Dr. Herbert, because Mr. Johnson applied diathermy to his shoulder as well. He also prescribed various exercises. By mid-October, he found Alaywan's chest and shoulder had improved. Alaywan nevertheless still complained about his right ankle and knee; however, Johnson did not find any more swelling in these areas.
By mid-December, Dr. Herbert was unable to explain Alaywan's continuing complaints, so he referred him to an orthopedist, Dr. Baer Rambach, who first saw him on December 30. Dr. Rambach found Alaywan had a slight limp favoring his right foot; he found some grating under the right knee, called chondromalacia, which can result from direct impact on the knee; and he found tenderness about the back of the tenth and eleventh rib on the right side. Dr. Rambach diagnosed contusions to the lower back of the spine, right shoulder and right ankle, with a probable sprained ankle; a brush burn to the left elbow; and bruises and contusions to both knee joints. Alaywan also complained of pain in his neck and back, but Dr. Rambach could not find any muscle spasm, and observed a full range of motion. Dr. Rambach advised him to exercise at home (Alaywan was apparently well conditioned by martial arts, having held a black belt in karate since 1977), and to sleep on an egg-crate pillow. On a subsequent visit in May 1989, Alaywan was still complaining of pain in his neck, lower back, right shoulder, left elbow and right ankle. Dr. Rambach found minimal swelling in the right ankle, leading him to diagnose a chronic ligamentous sprain; and he found the right kneecap still grating. He recommended therapy, but felt Alaywan would be better soon.
Meanwhile, Alaywan also complained of changes in his personality and intellect. After transferring from Beirut Arab University to Louisiana Tech in 1980, he earned his B.S. in civil engineering in 1984; he completed his M.S. in the summer of 1986 and promptly began the coursework for his Ph.D. At the time of the accident in August 1988, he lacked only a few hours of classes and his dissertation to earn the degree, which would lead him to his goal of becoming a university professor. Immediately after the accident, he claimed he wanted to resign from the university because he was not feeling well, *246 headaches began and he felt "not in control." However, he testified he remained to retain his assistantship and a loan he was receiving from The Hariri Foundation, a non-profit organization that supports Lebanese students pursuing higher education in the United States. Alaywan testified that he completed his coursework, but was unable to start his dissertation because he was upset, angry, disturbed and confused. He described a total lack of concentration, and frustration that grew with each missed deadline. He wanted seclusion and rest, and felt he could not communicate with others (even though he is fluent in Lebanese, French and English). He also described fear of traffic situations, and explosive anger whenever he saw a driver run a stop sign. He obtained a one-year extension from The Hariri Foundation, but even with this he claimed that he was unable to write his dissertation, or even submit an acceptable topic.
Despite his continuing physical complaints, the evidence shows Alaywan was active. Prior to the accident he had taught Tae Kwon Do two or three times a week. He resumed teaching in mid-1989, though stated he had to refrain from kumite (receiving and delivering blows) and was confined to kata (demonstrating). Prior to the accident, he also worked for the Tech Police as a ticket-writer. The Chief of Tech Police, Steve Quinnelly, testified that Alaywan also did this in 1989, working some 15 to 25 hours a week with extensive walking. And despite his feelings of seclusion, he met his future wife, Susan, in September 1989, and married her that December.
With no more money forthcoming from The Hariri Foundation, Alaywan took an entry level job at Denmon and Associates Engineers in Monroe. This "structural engineering" job paid only $12 an hour and was not permanent; he testified it was not his ultimate employment goal. Even at this simple job, he claimed that he had trouble with numbers and remembering instructions, and had antisocial feelings. Mr. Denmon verified that the job required only limited math ("up to calculus") and drawing skills. Mr. Denmon realized that Alaywan was not a licensed engineer, but he had an M.S. (many B.S. graduates were uninterested in this level of work) and a "good" résumé. Mr. Denmon never found any errors in Alaywan's calculations, and admitted that he was not in a position to observe his conduct at the office. The project for which Alaywan was hired concluded in March 1992; at the time of trial, he was not employed.
On the recommendation of his attorney, Alaywan saw a clinical psychologist in Monroe, Dr. Bobby Stephenson, in March 1990, who noted post traumatic stress syndrome. Through a physician, Dr. Stephenson put Alaywan on Prozac, a newer anti-depressant, which apparently helped him.
In November 1990, Alaywan's attorney also referred him to Dr. Charlton Stanley, a psychologist at the University of Mississippi in Jackson. Dr. Stanley ran a battery of personality and neuropsychological tests, with the following salient results. The Wechsler test placed Alaywan's I.Q. at 103, in the average range, but not adequate to earn a B.S. in civil engineering, let alone a Ph.D. The Bender Visual-Motor Gestalt test yielded results that Dr. Stanley called "disastrous." On the Suicide Probability Scale, Dr. Stanley gave Alaywan a 63 (a score of 70 would require hospitalization). On the Halstead Categories test, Alaywan scored an 85; anything over 50 indicates organic brain damage. Dr. Stanley felt with "virtual certainty" that Alaywan sustained organic brain damage in the accident. However, Dr. Stanley is not a medical doctor and had no medical findings to support this conclusion. Nevertheless, he gave Alaywan a Global Assessment Function of 35%, which he described as "just functioning." He recommended psychiatric treatment for cognitive retraining, but said that even this would not enable Alaywan to write his dissertation.
On referral from Dr. Stanley, in April 1991, Alaywan saw Dr. William Knight, a medical doctor who is board-certified in physical medicine and rehabilitation. Dr. Knight accepted Dr. Stanley's diagnosis of minimal brain damage, but did not make any physical findings to confirm it; in fact, he conceded that this diagnosis arose from history only, given by Alaywan and his wife. His own mental exam of Alaywan was "unremarkable." *247 The physical exam was also unremarkable, except for mild to moderate weakness of the right ankle muscles, suggesting an incomplete ligamentous injury, and tenderness over the left elbow, consistent with chronic olecranon bursitis. Notably, he found no deficits in Alaywan's back or neck, and no limp favoring the right foot. He felt Alaywan was capable of resuming normal aerobic activity. To address the psychological complaints, he recommended staying on Prozac, and trying Inderal Long-Acting for rage and Ritalin for attention deficit.
For further evaluation, Alaywan also saw Dr. Paul Ware, a psychiatrist and neurologist in Shreveport. Dr. Ware testified that Alaywan provided a long, detailed history without having to stop and think, indicating no trouble with his memory. He answered questions quickly, suggesting no problem in processing information. Dr. Ware gave him arithmetic and abstract thinking tests, on which Alaywan did satisfactorily. He could find no evidence of brain damage or significant psychiatric disease, but he noted that Alaywan suffered anxiety and depression by history immediately after the accident. He completely disagreed with Dr. Stanley's Global Assessment Function of 35%; a person with a function that low would need to be in the hospital. Dr. Ware estimated Alaywan's Global Assessment Function at about 75%.
Rounding out his evidence at trial, Alaywan called Dr. Richard Galloway, a certified rehabilitation counselor. Dr. Galloway testified as to the average income of a civil engineer, depending on his degree in the private sector and on his seniority as a professor at a college. Alaywan's income of $24,900.00 a year at Denmon and Associates was about $4,000.00 below the average starting salary for a civil engineer with a B.S.; however, Alaywan was not yet licensed. Also testifying was Dr. Melvin Harju, an expert in economics and finance. Based on the assumption that the accident prevented Alaywan from earning the kind of salary estimated by Dr. Galloway, Dr. Harju projected Alaywan's future economic loss for the remainder of his work life.

ACTION OF THE TRIAL COURT
As noted, the jury found that Ms. Love was at fault in causing the accident and that Alaywan was not. The jury awarded special damages of $8,828.29, apparently covering all of Alaywan's claimed medical and pharmacy bills except Dr. Stanley's fee of $1,970.00. The jury then awarded general damages of $13,671.71, representing "physical pain and suffering and mental anguish, past, present and future," for a total of $22,500.00. The jury specifically rejected the claims for lost earning capacity, past and future, and for permanent disability. The trial court entered judgment pursuant to the verdict.
Alaywan now appeals, urging generally that the jury erred in failing to award all damages sustained and proved at trial. Specifically, he contests the failure to award all damages for physical pain and suffering, mental pain and anguish, medical expenses, loss of past earnings, loss of future earnings and earning capacity, and permanent physical and mental disability.

APPLICABLE LAW
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La.C.C. Art. 2315. In a personal injury suit, the plaintiff has the burden of proving a causal relationship between the accident and the injuries complained of. American Motorist Ins. Co. v. American Rent-All Inc., 579 So.2d 429 (La.1991). A defendant takes the victim as she finds him and is responsible for all natural and probable consequences of her tortious conduct. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
The appellate court may not set aside the jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). This is because only the fact finder can be aware *248 of the variations in demeanor and tone of voice that bear so heavily on the listener's belief in what is said. Id.; Virgil v. American Guarantee & Liab. Ins. Co., 507 So.2d 825 (La.1987). When factual findings are based on the jury's decision to credit the testimony of one of two or more witnesses, those findings can virtually never be clearly wrong. Rosell v. Esco, supra at 845, and citations therein.
When damages are insusceptible of precise measurement, much discretion is left to the jury for the reasonable assessment of these damages. La.C.C. Art. 1999. An appellate court may disturb the jury's award only on the showing of a clear abuse of discretion. Coco v. Winston Industries Inc., 341 So.2d 332 (La.1976). Upon this showing, the appellate court may adjust the award by raising it to the lowest, or lowering it to the highest, point reasonably within the court's discretion for that case. Id.; American Motorist Ins. Co. v. American Rent-All, supra.

DISCUSSION
Alaywan's most expansive and detailed argument (22 pages of original brief, nine of reply brief) concerns his alleged psychological and neurological damages and their economic consequences on his life. The premise is that before the accident, Alaywan was an excellent student and disciplined athlete, an overall achiever with an outgoing personality and no psychological or mental problems; but after the accident, his world fell apart, his academic progress halted, his mental ability seriously declined, his career hopes were dashed, and he was almost incapacitated by depression. Alaywan relies heavily on the deposition of Dr. Stanley, who found organic brain damage with "virtual certainty." He also cites two cases, American Motorist Ins. Co. v. American Rent-All, supra, and Miley v. Landry, 582 So.2d 833 (La.1991), as "strikingly similar" to his own and supporting an award of $300,000.00. He finally urges that his derailed career aspirations support Dr. Harju's calculations of lost earnings and earning capacity in excess of $1.1 million.
The jury obviously disagreed with these arguments and its verdict is supported by the record. In the first place, apart from Alaywan's own testimony, there is a conspicuous absence of "before and after" evidence about his mental condition. Notably, Alaywan's wife did not meet him until after the accident, so she was in no position to say how he had changed; however, she was more adamant than Alaywan was in describing the alleged changes to Dr. Knight. Alaywan called none of his family members (all of whom are described as achievers, like himself) or friends to verify the alleged downturn in his personality. One witness, Steve Quinnelly, testified that he had known Alaywan since 1985 at Tech Police, and he noticed no change in his personality after the accident.
Moreover, the documentary evidence does not show that Alaywan was mentally damaged by the accident. His Louisiana Tech transcript, offered as Exhibit P-10, shows mediocre grades in his undergraduate and many of his M.S. classes, thus casting doubt on his trial testimony and his reports to various physicians that he always made excellent grades. After the accident, he took fewer classes and his grades actually improved. His record also shows that he was only conditionally admitted to the Masters program in the Fall of 1984. Dr. Leslie Guice, professor and head of the Department of Civil Engineering, testified that Alaywan did not take the GRE until Spring 1986 and that he scored only a 1270, far below the minimum of 1550 required for the Ph.D. program. The evidence also shows that during his two years in the Ph.D. program prior to the accident, he had neither submitted a dissertation topic nor started any research. This certainly suggests that the writing impasse that allegedly plagued him after the accident may well have antedated it. Dr. Guice also testified, from Alwayan's records, that Alaywan taught Engineering Mechanics on assistantship for two quarters after the accident; he received good evaluations.
In addition, the expert testimony does not support Alaywan's argument. Dr. Stephenson, who probably gave the most helpful testimony to Alaywan's case, admitted that his diagnosis was based largely on a history provided by Alaywan himself, and on an assumption *249 that his I.Q. of 91 was incompatible with his scholastic history. The value of this opinion diminishes in light of evidence that Alaywan probably overstated both his pre-accident academic success and his post-accident failure. Dr. Stephenson did not diagnose brain damage, but found depression which was alleviated by medication. Dr. Knight, whose testimony was fairly neutral to Alaywan, relied even more than Dr. Stephenson on the plaintiff's own complaints and those of his wife, who did not even know Alaywan before the accident. Dr. Knight also adopted, apparently without independent findings, Dr. Stanley's diagnosis of brain damage; but, elsewhere he said Alaywan's mental exam was "unremarkable." Curiously, Dr. Knight found Alaywan more hyperactive than depressed.
Dr. Stanley, who testified by videotaped deposition, must be credited with performing a huge battery of tests on Alaywan. However, his finding of organic brain damage was based on an assumption that Alaywan struck his head directly or on the rebound in the accident. This "fact," however, was never reported to Officer Caraway, Dr. Byram or Dr. Herbert; Alaywan testified that he suffered from headaches immediately after the accident, but he reported this to Dr. Herbert on only one occasion, about a month after the accident, and Dr. Herbert felt that it was "not prominent"; and the complaints of tinnitus were also not reported. These facts undermine the basis for Dr. Stanley's opinion. Yet Dr. Stanley gave Alaywan a Global Assessment of 35%, meaning that 65% of Alaywan's brain or "whole person" was not functioning. This is patently inconsistent with the cogent testimony given by Alaywan at trial. Dr. Ware disputed Dr. Stanley's diagnosis, explaining that a person with an Assessment of 40% "can't even take care of [his] own welfare," is "impaired" and must be "literally tended to." This is certainly not Alaywan's condition. Finally, Dr. Stanley admitted he was generous in finding organic brain damage in patients referred by Alaywan's attorney. Under the circumstances, the jury was not plainly wrong to reject Dr. Stanley's diagnosis.
In sum, this is not a case in which before the accident, the injured person was in good health, but commencing with the accident, the symptoms of disabling mental and psychological damage appear and continuously manifest themselves afterward. See Housley v. Cerise, 579 So.2d 973, 980 (La.1991). The jury did not find credible evidence that Alaywan's mental and psychological condition, or his ability to pursue his academic goals and find employment in his field, were impaired after the accident. On the contrary, the jury could have found that these complaints were not sincere, or that Alaywan's long-term depression was more likely the result of his scholastic struggles and his large outstanding debt (over $50,000) to The Hariri Foundation.
Finally, we distinguish American Motorist Ins. Co. v. American Rent-All, supra, and Miley v. Landry, supra, as factually inapposite. Both of these cases involved plaintiffs who, prior to their accidents, had been diagnosed with latent psychiatric problems and declined to serious psychotic conditions thereafter.
The jury was not plainly wrong to reject Alaywan's claims of mental disability, lost earnings and lost earning capacity.
With this said, we may quickly dispose of the argument that contests the jury's denial of recovery for Dr. Stanley's psychological exams. The jury obviously rejected his diagnosis as utterly inconsistent with Alaywan's speech and demeanor at trial, and denied the charge. Admittedly, the tortfeasor is liable to the victim for unneeded medical treatment in the absence of bad faith on the victim's part. Tyler v. Richardson, 476 So.2d 899 (La.App.2d Cir.), writ denied, 478 So.2d 907 (La. 1985), and citations therein. However, the tortfeasor is not liable for items of medical expense incurred not for treatment, but rather in the preparation of the case for trial. McCrory v. Great American Indem. Co., 92 So.2d 742 (La.App.2d Cir.1957); Daener v. Berwick, 556 So.2d 1353 (La.App. 5th Cir.1990). Dr. Stanley admitted that he saw Alaywan not on referral from another physician, but on referral from plaintiff's counsel (for whom he has found a number of cases of organic brain damage). While Dr. Stanley recommended that Alaywan *250 continue his treatment and medication with Dr. Stephenson, it is clear that Dr. Stanley only tested and did not actually treat Alaywan. Cf. Adams v. Security Ins. Co. of Hartford, 543 So.2d 480, 486 (La.1989). Given these facts, the jury did not abuse its discretion in denying this item of special damages.
Alaywan finally contends that the $13,671.71 general damage award is abusively low. The unquestioned physical injuries suffered by Alaywan as a result of the accident consisted of bumps, bruises, abrasions, a sprained right ankle, a possible fracture of the tip of a rib, and a knee bruise resulting in some residual chondromalacia. Unquestionably, these injuries produced pain and suffering until they healed within a few months. As pointed out earlier in this opinion, other complaints were not made by plaintiff until well after the August 1988 accident and could reasonably have been rejected by the jury. Further, although plaintiff complained to Dr. Herbert of depression in early September 1988, he sought no medical attention for it until he was sent to Dr. Stephenson by his attorney in March 1990. Dr. Stephenson's finding of post traumatic stress syndrome was obviously based on the plaintiff's subjective complaints, which the jury clearly rejected in other areas. Even though the jury allowed recovery for Dr. Stephenson's bills and for the medication given, it could have reasonably concluded that plaintiff's subjective complaints of depression were exaggerated.
As the Louisiana Supreme Court has just stated in Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993), the discretion vested in the trier of fact in setting general damages is "great, and even vast, so that an appellate court should rarely disturb an award of general damages." Based on this record and the apparent lack of credibility the plaintiff had with this jury, we cannot say the general damages award is an abuse of the jury's vast discretion.

DECREE
For the reason expressed, the lower court judgment is affirmed. Appellant is cast with all costs on appeal.
AFFIRMED.
NORRIS, J., dissents with written reasons, with attached unpublished appendix.
MARVIN, C.J., dissents for reasons assigned by NORRIS, J.
NORRIS, Judge, dissenting.
I am convinced that the majority has seriously understated each of Alaywan's valid complaints to affirm the unreasonably low verdict. The most noticeable understatements pertain to the broken rib. The majority correctly notes that on his first trip to Lincoln General, Alaywan's chest was X-rayed and the radiologist noted a "questionable" fractured rib. Based on this, the majority has permanently declared the injury only a "possible" fracture. The fact is that after that initial radiological note, every doctor who treated Alaywan (Drs. Herbert and Byram) diagnosed a fractured rib. Alaywan had to wear a rib belt for several weeks after the accident. This may not be in the nature of a grave injury, but it is certainly painful and greater than the majority has described it. The injuries to Alaywan's ankle and knee are similarly understated. I am convinced that the injuries were significant, especially to a person of Alaywan's physical training and discipline. I am further convinced that these injuries persisted longer than the "few months" that the majority accepts.
What is less apparent from the majority opinion is the scope and importance of Alaywan's emotional damages. The opinion brushes off Dr. Stephenson's testimony with a scant five lines of text. In fact, Dr. Stephenson saw Alaywan 20-25 times over a period of 20 months, more than any other medical expert. He diagnosed both depression and PTSS. He prescribed the anti-depressants and tranquilizers that ultimately brought Alaywan back to a somewhat normal life more than 19 months post accident. By contrast, Dr. Ware saw Alaywan once, three years after the accident. Even though he was retained to give a defense opinion, Dr. Ware did not contradict Dr. Stephenson's finding of depression and PTSS; he merely tempered it by observing "some malingering." *251 If Dr. Ware had felt that malingering was the primary feature of Alaywan's complaints, he would have made it the focal aspect of his diagnosis. He did not, though he showed he could dismiss another doctor's findings, as he did with Dr. Stanley. Moreover, as the majority accurately notes, the jury did award Dr. Stephenson's medical expenses and all the drugs prescribed through him. If the jury had rejected the reality of the complaints and the need for the treatment, it logically would have denied recovery for Dr. Stephenson's charges, as it did with Dr. Stanley's charges for treatment of organic brain damage. The jury must have concluded that Dr. Stephenson's treatment for depression and PTSS was reasonable, valid and necessary. Finally, jury's award of general damages specifically included "mental anguish, past and future" (emphasis added).
This evidence taken togetherAlaywan's direct testimony as to depression and PTSS, Dr. Stephenson's diagnosis to that effect, Dr. Ware's tempered but largely corroborative diagnosis, and the approval of Stephenson's costsclearly shows that Alaywan proved, to the jury's satisfaction, depression, PTSS, and the need for treatment therefor. The evidence also clearly shows that Alaywan sustained physical injuries that were not life-threatening but were significant and of long duration. On the record presented, I cannot agree that an odd general damage award of $13,671.71 was within the jury's range of reasonable discretion. The $13,671.71 award is abusively low. I would affirm the judgment as to specials and increase the generals from $13,671.71 to $30,000.00, the lowest reasonable amount.
Finally, the majority appends a quote from the recent case of Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), for its cautionary language against disturbing jury awards, to which I heartily subscribe. Ironically, the supreme court in that case reinstated a verdict which the court of appeal had drastically reduced by over 50%. Hae Woo Youn must be read with the well established rule of Coco v. Winston Industries Inc. and Reck v. Stevens: An initial determination of abuse of discretion requires the appellate court to raise an unconscionably low award to the lowest range permissible under the facts.
An Appellate Court should not avoid its Constitutional responsibility of reviewing facts and law. The review of jury awards is a viable and important part of the appellate function, just as is appellate respect of a trial court's discretion. The Appellate Court should exercise its responsibility in the instant case, and I respectfully dissent from the majority's unwillingness to do so. This general damage award of $13,671.71 is abusively low.
Attached is an unpublished appendix of the draft opinion that sets forth in detail my proposed disposition of the case.