751 So.2d 928 (1999)
INDUSTRIAL ROOFING & SHEET METAL WORKS, INC., Plaintiff-Appellee,
v.
J.C. DELLINGER MEMORIAL TRUST, Defendant-Appellant.
No. 32,048-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1999.
Rehearing Denied September 16, 1999.
*932 Gary L. Fox, Shreveport, Counsel for Appellant.
Walter D. White, Counsel for Appellee.
Before NORRIS, C.J., and WILLIAMS, STEWART, PEATROSS and KOSTELKA, JJ.
STEWART, J.
This case arises out of a contractual dispute between the appellant, J.C. Dellinger Memorial Trust (the Trust) and the appellee, Industrial Roofing & Sheet Metal Works, Inc. (Industrial). The Trust appeals the judgment by the Honorable Charles W. Kelly, IV, Shreveport City Court for the Parish of Caddo, in favor of the appellee, finding that Industrial is entitled to the balance due on the contract for the performance of roof repairs, that Industrial is entitled to interest from the date of judicial demand, plus all costs of court and rejecting the Trust's Reconventional Demand. We reverse in part, affirm in part, amend in part and as amended render.

FACTS
On June 21, 1993, the Trust entered into a contract with Industrial for roof work on the B'nai Zion Temple (Temple) located at 800 Common Street, Shreveport, Louisiana. After Industrial allegedly completed the work, the Trust refused to pay for the services rendered alleging defective performance, defective repairs, damages and incomplete repairs. The Trust paid $54,000 of the contract and retained $10,000. Industrial filed suit and the Trust answered the suit claiming offset for defective performance, pleading accord and satisfaction and estoppel. The Trust also reconvened for damages it sustained for defective repairs, damages or incomplete repairs.
Trial was held on October 28, 1997. In response to Industrial's suit for the balance due, the Trust argued that there was an agreement and that Industrial failed to use copper to repair the "hog valleys" on the roof, that Industrial failed to waterproof the parapet wall and to connect an inner roof drain to an outer gutter which resulted in further water damage to the Temple, and that a crack in the parapet wall resulted from Industrial's scaffolding. The Trust further argued that Industrial removed a segment of the hog valley above a historic stain glass window to inspect the wood and that Industrial's failure to replace or reseal this membrane allowed the drainage in this valley to spill over the top and damage this stain glass window and surrounding wood and plaster.
The trial court erroneously rendered an opinion on January 2, 1998 prior to receiving the Trust's Post-trial Brief. The trial court rendered another opinion that revoked the previous opinion in its entirety. In the February 12, 1998 opinion, the trial court found that there was no common intent of the parties to specify copper to be used in repair of the hog valleys, that the contract was written with a base plus alternatives for additional work to be added to the base bid, that these alternatives were specific references to the nature and type of materials and that if there had been any intent to specify copper in repair of the hog valleys, the parties could have specified such in the contract.
The trial court further found that nothing in the contract provided for any work inside the building and not for repair of the down spouts. However, the court did find that a crack in the exterior masonry wall, in the vicinity of the scaffolding erected *933 by Industrial, was attributable to Industrial and reduced the balance due to Industrial. Therefore, the trial court found that Industrial was owed the net sum of $9,548.00 and that the remaining demands of the Trust were denied.
The Trust filed a Motion for New Trial based upon their contention that photographic evidence verified that an Industrial superintendent provided false testimony that Industrial extended the membrane in the hog valley up to the top of the parapet wall and counter flashed this membrane. Industrial's failure to do so resulted in further damage to the Temple. The Motion for New Trial was denied on May 27, 1998. This appeal by the Trust followed. The appeal was answered by Industrial seeking an increase in the sum awarded.

DISCUSSION
Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. Martin Exploration Co. v. Amoco Production Co., 637 So.2d 1202, 93 0349 (La. App. 1st Cir.5/20/94), rehearing denied, writ denied 644 So.2d 1048, 94-2003 (La.11/4/94). However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Noel v. Discus Oil Corp., 30,561 (La.App.2d Cir.5/13/98), 714 So.2d 105, 107; McDuffie v. Riverwood Intern. Corp., 27,292 (La. App.2d Cir.8/23/95), 660 So.2d 158; Conoco, Inc. v. Tenneco, Inc., 524 So.2d 1305 (La.App. 3d Cir.1988), writ denied, 525 So.2d 1048 (La.1988).
The contract is the law between the parties. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art.2046. Courts may not disregard a clear and explicit clause of a contract. Amend v. McCabe, 664 So.2d 1183, 1187 (La.1995); Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970).
The courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. The meaning and intent of the parties of the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. Under Louisiana law, when there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms. If this intent cannot be adequately discerned from the contract itself, the court may then consider evidence as to the facts and circumstances surrounding the parties at the time the contract was made. Liem v. Austin Power, Inc., 569 So.2d 601, 608 (La.App. 2 Cir.1990). Whether a contract is ambiguous or not is a question of law. Id.

CONTRACT FOR USE OF COPPER
In the appellant's first assignment of error, the Trust urges that the trial court erred in finding that there was no contract term requiring copper hog valleys. The Trust urges that Alternate No. 2 of the contract establishes an agreement to install copper hog valleys in the narrow perimeter valleys that drain the entire roof and that the contract term "copper valleys" specified copper hog valleys. The largest portion of the roof, which is the subject of the contract, is bound on all sides by a steep sloping slate roof. The entire roof is drained over the slate roof into hog valleys which are narrow perimeter channels or valleys that collect all of the water.
*934 The Trust further asserts that it was leakage within the hog valleys and the determination to stop all leakage that prompted a replacement of the entire roof, that copper valleys were not installed and that the trustee who negotiated the contract on behalf of the Trust testified that there was an agreement to install copper valleys. A.H. Hollowell (Mr. Hollowell), who negotiated on behalf of Industrial, was deceased at the time of trial and none of the plaintiff's witnesses claim to have discussed this issue with Mr. Hollowell or the trustee. The Trust contends that Industrial was engaged as the contractor because of their expertise and experience in installing copper and that Alternate Nos. 1 and 2 of the contract were elected with the Base Bid. The contract reads:
Base Bid:
"Remove the existing built up roof, metal roof, and hog valleys. Apply a new four ply fiberglass felt built up roof, hog valley, cant strips, built up base flashings, tar guard, and prefinished metal gravel guard. Replace two roof ventilators and install a new prefinished metal standing seam roof at the sloping roof. Waterproof the parapet walls. For the sum of $39,970.00."
Alternate No. 2 provides:
"Furnish and install a Vermont Natural Slate roof, 16oz.copper valleys, and four copper dormer louvers in the sloping area, in lieu of the metal standing seam roof. Add to the Base Bid the sum of $15,585.00."
Therefore, the Trust seeks a reversal of the trial court finding that there was no common intent of the parties to specify copper to be used in repair of the "hog valleys," as the contract by its express written terms required 16 oz. copper valleys which were not installed and a breach of contract specifications occurred. Furthermore, the remedy for defective construction is an award of damages as necessary to repair or replace the defect. The estimated cost of replacing the hog valley is between $23,500-$39,000.
However, Industrial argues that the contract is clear and unambiguous, that nowhere in the contract is there included a statement that the Trust was getting "copper hog valleys" anywhere, except as specified, and that the work was performed correctly. In fact, that Alternate is specifically rejected and the contract was never modified in writing or otherwise. Therefore, the trial court's findings were correct.
The trial court's initial inquiry should be whether the words of the contract clearly and explicitly set forth the intent of the parties. This methodology limits the interpretation of a contract to the internal language of the contract itself. A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation. Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981); Noel v. Discus Oil Corp., supra at 110.
After careful review of the contract, we find that the contract has three alternatives that may be added to the base bid, if selected. "Alternative No. 3" has lines drawn through it, indicating that "Alternative No. 3" is not selected or is not included in the contract. However, "Alternative No. 2", clearly states, in pertinent part, "Furnish and install Vermont Natural slate roof, 16 oz. copper valleys ..."
Courts may not disregard a clear and explicit clause of a contract. Maloney v. Oak Builders, Inc., supra. The contract clearly states that copper valleys are to be furnished, a provision bearing on the issue of intent. Copper valleys and hog valleys are two separate and distinct portions of the roof. The hog valleys refer to the exposed gutter, trough-like portions of the roof and the copper valley is the portion of the roof under the slate.
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested *935 by the contract as a whole. La. C.C. art.2050. Here, each provision of the contract is assigned a value. It is undisputed that the cost of the job was $62,545.00. After adding the assigned values for the base bid ($39,970.00), Alternative No.1 ($6,990.00), and Alternative No. 2 ($15,585.00), the total cost of the job is $62,545.00, confirming that "Alternative No. 2," which specified copper valleys, is included in the contract and shows the intent of the parties to install copper valley.
After a thorough review of the record, we conclude that the words of the contract are clear, concise, and unambiguous with the specific designation in the contract for "16 oz. copper valleys" and the trial court decision is legally correct in denying this allegation of the Trust's Reconventional Demand.
Although, the Trust urges that there has been no testimony that the 16 oz. copper valleys specified in the contract are installed under the slate, no proof was presented by the Trust to show that the copper valleys are not installed underneath the slate. The plaintiff bears the burden of proving each element of his claim by a preponderance of the evidence. Corley v. Craft, 571 So.2d 718 (La.App. 2d Cir.1990). Proof by a preponderance of the evidence means that the evidence, when taken as a whole, shows that the fact to be proven is more probable than not. Crowell v. City of Alexandria Through Snyder, 558 So.2d 216 (La.1990); Bradley v. Manville Forest Products, 616 So.2d 280 (La.App. 2d Cir. 1993). No evidence was presented showing that the slate was removed to determine whether or not the copper valleys are installed. We are of the opinion that the evidence produced by the Trust failed to satisfy its burden of proving by a preponderance of the evidence its claim that copper valleys are not installed under the slate. Therefore, no breach of contract specifications occurred.
Next, we address the allegation regarding the hog valleys. The Trust urges that Alternate No. 2 of the contract establishes an agreement to install copper hog valleys in the narrow perimeter valleys that drain the entire roof and that the contract term "copper valleys" included copper hog valleys. The only mention of the exact words "hog valley" is in the base bid, which reads:
"Remove the existing built up roof, metal roof, and hog valleys. Apply a new four ply fiberglass felt built up roof, hog valley, cant strips, built up base flashings, tar guard, and prefinished metal gravel guard. Replace two roof ventilators and install a new prefinished metal standing seam roof at the sloping roof. Waterproof the parapet walls. For the sum of $39,970.00."
The trial court found that "[t]he parties did not specify materials, where they did for other types of repairs. It is clear the contractor was obligated to make repairs consistent with those conditions understood in the trade."
While it is true that the contract does not specify the type of material to be used in the repair of the hog valley, it does not mean that Industrial could use any type of material it deemed necessary to make the repairs. Further ambiguity is shown by the fact that the Trust understood the material description "copper valley" to include the hog valley. Under Louisiana law, when there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms. If this intent cannot be adequately discerned from the contract itself, the court may then consider evidence as to the facts and circumstances surrounding the parties at the time the contract was made. Liem v. Austin Power, Inc., supra.
In following the aforementioned guidelines, we must consider evidence as to the facts and circumstances surrounding the parties at the time the contract was made. Given the specific designation of the building as a historic place and its entrance into *936 the National Register of Historic Places, the regulations regarding rehabilitation of historic buildings, the fact that the original hog valleys, which Industrial removed, were copper, and the fact that the Trust engaged Industrial as the contractor because of their expertise and experience in installing copper, it is reasonable for the Trust to believe that the copper hog valleys would be replaced with copper hog valleys. It is reasonable for the Trust to expect that the contractor would make repairs consistent with those conditions understood in the trade, such as the restoration and repair of the roof of a historic building.
Cox, the plaintiffs expert, testified that the slate roof installed has a fifty to sixty year life expectancy but the hog valleys Industrial installed have at best a twenty year life expectancy, which would necessitate replacing the hog valleys three times during the life of the roof. Cox explained that in order to replace the hog valleys the slate must be remove and reinstalled, which is why materials with similar life expectancies should be used. Similarly, Mrs. Jolene C. Harms ("Mrs. Harms"), a trustee for the Temple and signatory on the contract, testified that based upon her conversations with the deceased Mr. Hollowell she understood and expected that they would have a slate roof and copper hog valleys with similar life expectancies so that the hog valleys would not have to be changed, providing the highest degree of lasting ability. Mrs. Harms further testified that during contract negotiations replacement of the original 1907 slate and copper roof with a slate and copper roof were discussed, and that she trusted Mr. Hollowell.
Mrs. Harms further provided undisputed testimony that Mr. Hollowell was familiar with the roof and its historical significance because Industrial had been the primary roofing contractor, doing patch work, prior to 1993 and that bids were received from other companies, but they either did not have the experience or the ability to do the historic metal and slate roof.
A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. LSA-C.C. Art.2049. Where a contract is capable of construction in accordance with justice and fair dealing, courts will adopt such construction instead of one entailing loss to a party to the contract. Terrell v. Alexandria Auto Co., 12 La.App. 625, 125 So. 757, 758 (La.App. 2d Cir.1930); Bonfanti v. Davis, 487 So.2d 165 (La.App. 3rd Cir. 1986); Haymon v. Holliday, 405 So.2d 1304 (La.App. 3d Cir.1981); Walsh Bros. v. Celeron Corp., 510 So.2d 1282, 1285 (La. App. 3d Cir.1987).
While the trial court correctly found that the parties did not specify in the contract the type of materials to be used in the hog valley repair, we consider several factors: 1) they specify in the contract the type of materials for other types of repairs; 2) Industrial drew up the contract that did not specify the type of material for this particular item and could have stated the type of materials to be used in the repair; 3) and the fact that the Trust considered the term "copper valley" to be inclusive of hog valleys, therefore the contract is unclear as to the type of material to be used in the hog valley repairs.
Although we conclude that the trial court was legally correct in finding that there was no common intent in the contract of the parties to specify copper to be used in repair of the hog valleys, we find that the contract is unclear as to the type of material to be used in the repair of the hog valleys. In the interest of justice and equity, we must go beyond the contract in order to determine the true intent of the parties regarding the type of materials to be used in the hog valley repairs. This court has also looked at the applicable articles of the Louisiana Civil Code in effect at the time of the contract in order to determine their intent and to properly *937 assist us in properly characterizing their rights.
It is doubtful that the Trust intended to restore a historic roof with materials of a lesser quality. It is reasonable to infer that based upon the circumstances surrounding the contract that the parties knew that the work was to be performed on a roof with historic significance, a roof which repairs and the materials to be used were constricted by its designation as a historic place and the regulations regarding rehabilitation of historic buildings.
A contract should be viewed and interpreted as a whole, and all ambiguities construed against the party who prepared it. Fontenot v. Klumpp, 461 So.2d 579 (La.App. 3rd. Cir.1984), writ denied, 465 So.2d 738 (La.1985); Cahn Elec. Co., Inc. v. Robert E. McKee, Inc., 490 So.2d 647 (La.App. 2d Cir.1986); Edwards v. Terminix 57, Inc., 292 So.2d 851 (La. App. 2d Cir.1974). The customs of the industry may be considered when construing ambiguous contracts. Any deviation from industry custom should have been expressly stated in the agreement. Kenner Industries, Inc. v. Sewell Plastics, Inc., 451 So.2d 557, 560 (La.1984).
In this case, the specifications and general contract were prepared by Industrial and on Industrial letterhead. The Trust did not participate in the preparation of any documents. While Industrial may have intended the phrase "copper valley" to exclude hog valleys, their duty as drafters of the agreement was to make that intention clear to the Trust. Furthermore, if Industrial intended to use material other than the type removed or other than those types of materials which are customary and consistent with repair on historical buildings, then their duty as drafters of the agreement was to make that intention clear.
Viewing the various components of this agreement as a whole, we cannot say that this intent was expressed with sufficient clarity to be effective. We are reinforced in this conclusion by the fact that the intent to include or exclude types of material to be used was so clearly expressed elsewhere in the contract.
Under these circumstances, the contract should be interpreted to include hog valleys in the term "copper valleys". We therefore reverse that portion of the trial court's judgment rejecting this portion of the Trust's Reconventional Demand.

DEFECTIVE INSTALLATION OF THE MEMBRANE
In assignment of error number two, the Trust urges that the trial court erred in not finding that there was additional damage caused by the defective repair of the roof. Specifically, that Industrial failed to extend the membrane in the hog valley up to the top of the parapet wall and counter flash the membrane. The two ply membranes as installed by Industrial in the hog valleys contain large areas filled with trapped water which have resulted in the hog valley membranes failing and necessitating replacement. Visual inspection and photographs of the built-up roof at its juncture with the outer perimeter wall of the Temple shows that the membrane was pasted with asphaltic emulsion to the outer perimeter wall and that it extended part way up this wall and that there is no counter flashing over the top of the membrane to prevent water from seeping in.
Industrial's failure to counter flash the membrane is also a construction defect. All witnesses testified that counter flashing is essential and no witness testified that the hog valley membrane was not failing. Counter flashing is essential to shed water out and over the top of the membrane. In fact, Industrial's superintendent, Lyndell Polk ("Polk"), testified at his deposition that the membrane should not be failing so soon after its installation.
In furtherance, the Trust contends that upon Industrial's recommendation all wood under this membrane was repaired and replaced as necessary to ensure the integrity of the membrane. The Trust further *938 contends that it paid in full the extra charges for this replacement and that the Base Bid contract includes a 5-year labor and material guarantee and that this failure of the membrane invokes that guarantee. Furthermore, the remedy for a defective installation is the cost of repair and if necessary, the cost to replace the defective construction. The cost to cure the defective installation of the membrane and to install a replacement membrane in the hog valleys is $23,500.
On the other hand, Industrial asserts that Mr. Polk testified that he was repeatedly on the job and that the work was completed to contract. In addition, Mr. Russell Bagwell ("Mr. Bagwell") testified that roofers normally handle the flashings and metal work, that the waterproofers handle the coping stones and that it is the architect who decides where the roof stops and the waterproofing starts. However, the Trust did not have an architect. Mr. Bagwell further testified that a roofing contractor does not normally deal with coping stones and parapet walls, and that a waterproofer should have accomplished this work before the roofing contractor roofed the building.
Moreover, the Trust is obligated to mitigate damages and its failure to waterproof coping stones, the parapet wall or to take any protective action of the interior of the building shows the Trust's disregard for the care of a building it refers to as a priceless treasure.
Industrial concludes that any leaks that exist came from neglect by prior owners and the Trust and that the Trust failed to provide even minimal care for the building and now seeks to hold Industrial liable for past, present and future damages. Even the Trust's witness, Ron Cox ("Mr. Cox"), engineer, could not attribute a single leak to the work performed by Industrial. Any photographs taken by the Trust were taken years after the work was accomplished and then only in preparation for the trial. Therefore, the trial court correctly rejected the Trust's Reconventional demand.
After reviewing the record and exhibits, it is quite apparent, based upon the history of this roof, that the principal motive and intent of entering into the contract with Industrial was to put an end to the leakage problem. There is no dispute that Industrial has not done this. The only dispute is the cause of this roof's failure and the consequent measures to be taken to remedy the problem. It has been repeatedly held that a leaking roof on a building is a defective roof. Dodd v. Tucker, 528 So.2d 644 (La.App. 2 Cir.1988); Hunter v. Wilson, 355 So.2d 39 (La.App. 3 Cir.), writ denied, 357 So.2d 1154 (La. 1978).
Plaintiff's principal expert, Ron Cox ("Cox"), had nineteen years of experience in roofing and sheet metal. Based upon an inspection of the Temple in 1995, after the work by Industrial, Cox noted numerous defects. He testified that he found trapped water in the hog valley membranes, hog valley membranes did not extend up the entire parapet wall, the parapet wall was not waterproofed, no counter flashing over the top of the membrane to shed out water and an inadequately sized strainer which trapped debris, causing water to back up.
Furthermore, Cox testified that although the flat roof was a four ply built up roof, the hog valleys were not the four ply built-up hog valleys designated in the contract; they were a different type of construction. Cox further testified that there was water trapped in the membranes and blisters in the hog valleys "which tells you that water is getting in from somewhere. Whether it is either coming in from the slate side and getting into the membrane or coming from the parapet side and getting into the membrane."
He opined that the condition of the roof was such that the only satisfactory solution for the leaks would be to remove all the slate on the entire roof, stack it up, put in copper valleys, re-felt it and then reinstall the slate, using clips rather than the nail *939 holes and that such repairs would cost $39,000.
As stated in Graeme Spring & Brake Service v. De Felice, 98 So.2d 314 (Orl.App.,1957), the word "repair" contemplates "an existing structure or thing that has become imperfect, and means to supply in the original existing structure that which is lost or destroyed and thereby restore it to the condition in which it originally existed as near as may be."
The liability of a contractor for damages due to defective workmanship are contained in Articles 2762 et seq of the Louisiana Civil Code. It has been jurisprudentially established that, implied in every building contract is the fact that the work of the contractor is to be performed in a good, workmanlike manner, free from defects in either materials or workmanship. An owner seeking to recover from a contractor for defective workmanship bears the burden of proving: 1) both the existence and nature of the defects; 2) that the defects were due to faulty materials or workmanship, and 3) the cost of repairing the defects. LSA-C.C. art. 2769. Fortier v. Sessum, 441 So.2d 1238 (La.App. 5th Cir.1983); Guy Williams Realty v. Shamrock Const, 564 So.2d 689 (La.App. 5th Cir.1990), writ den. 569 So.2d 982 (La. 1990); Bourgeois v. Arrow Fence Co., Inc., 592 So.2d 445, 448 (La.App. 5th Cir.1991).
The fact is that the Trust never got the roof it paid for in the first place, and it has suffered with a roof that leaked continuously since it was installed. We have carefully reviewed the records, exhibits, and the testimony of the expert called by the plaintiff. The evidence convinces us that the workmanship in the construction of the roof is so generally defective that it cannot be corrected except by removing and reinstalling the roof.
Accordingly, in assessing the damages for a defective roof, specifically, Industrial's failure to put an end to the leakage problem, extend the membrane in the hog valley up to the top of the parapet wall and counter flash the membrane, the Trust has a legal right to recover the cost of materials and labor to place plaintiff in the same position as if the obligation had been fulfilled. The evidence indicates that the roof can be repaired at an estimated cost of $39,200.00. We conclude that the Trust is entitled to recover $39,200.00 in damages. Furthermore, the trial court committed manifest error in its conclusions of fact.

DAMAGE CAUSED DURING CONSTRUCTION
In assignment of error number three, the Trust urges that the trial court erred in failing to award damages to the Trust for damage caused during construction, that prior to construction Industrial removed a segment of the hog valley to inspect the condition of the wood under it and failed to reseal or replace the area, resulting in water from the hog valley pouring over and damaging the most northerly stain glass window on the east side, the wooden frame and plaster. The Trust contends that the purpose of engaging Industrial was to protect priceless assets and that the estimated cost to repair was $2,500.
In addition, the Trust contends that Industrial crushed a drain pipe during construction, and that photos show Industrial's trucks parked on the sidewalk over this pipe, which resulted in the drain being crushed under the sidewalk so that the four roof drains were blocked.
Further damage occurred at the northwest corner of the Temple because of Industrial's failure to connect an inner roof drain to an outer gutter which descends on the exterior of the Temple. The Trust contends that it paid $62,545.00 to replace a roof specifically to stop leaks in the Temple and that the trustee testified that discussions were held on the issue of assuring the flow of water from the roof to the ground to assure that there would be no further leakage. The Trust further contends that the cost of installing the *940 missing pipe was $375.00 and had the agreed upon work been performed one fourth of the water that exits from this roof would have ceased to enter and damage the Temple.
However, Industrial argues that the Trust admits that the building when purchased had serious damage, leaks, rotting and water damage, and that the Trust failed to provide even minimal care for the building. The trial court correctly found that nothing in the contract provided for any work inside the building nor for repair of the down spouts. All of the work was strictly on the exterior of the building per the contract.
In a civil action, the plaintiff bears the burden of proving each element of his claim by a preponderance of the evidence. Corley v. Craft, supra. Proof by a preponderance of the evidence means that the evidence, when taken as a whole, shows that the fact to be proven is more probable than not. Crowell v. City of Alexandria Through Snyder, supra; Bradley v. Manville Forest Products, supra. The trial court is given great discretion in determining whether the burden of proof has been met. A court of appeal may not set aside findings of fact by the trial court in absence of manifest error or unless it is clearly wrong. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). Where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review even though the appellate court may feel that its own evaluation and inferences are as reasonable. Alaywan v. Commercial Union Ins. Co., 625 So.2d 243 (La.App. 2d Cir.1993).
Industrial does not dispute that it removed a segment of the hog valley to inspect the condition of the wood under it and failed to reseal or replace the area, but defends its actions by arguing that the Trust failed to mitigate damages. In an effort to show that the removal of the hog valley did not cause damage, Industrial argues that the building already had serious damage, leaks, rotting and water damage.
Nevertheless, the record indicates that, given the exposure to rain, damage to the most northerly stain glass window on the east side, the wooden frame and plaster was more than likely caused by the removal of the hog valley to let the wood cure or breathe. The exhibits show that the window sustained water damage or detrimental contact with water after the removal of the membrane.
When property is damaged by the fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the accident. In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired. Coleman v. Victor, 326 So.2d 344 (La. 1976); Murphy v. K.D. Auger Trucking, Inc., 598 So.2d 443 (La.App. 2d Cir.1992), writ denied, 600 So.2d 685 (La.1992). However, no mechanical rule can be applied with exactitude to assess property damage; each case must rest on its own facts and circumstances as supported by proof in the record. Coleman v. Victor, supra; Smith v. English, 586 So.2d 583 (La.App. 2d Cir.1991).
We find that the Trust is entitled to an award of $2,500.00, which it has shown is the amount necessary to restore and repair the stain glass window on the east side, the wooden frame and plaster.
As for the next allegation in this assignment of error, that Industrial's trucks on the sidewalk crushed the drain under the sidewalk so that the four roof drains were blocked, we find that the plaintiff failed to satisfy the burden of proving each element of this claim by a preponderance of the evidence. Accordingly, we find no manifest error in the trial court's not finding in the Trust's favor.
*941 Next, we address the final allegation in this assignment of error, that Industrial failed to replace a missing pipe or reconnect the pipe which allowed water that exits the roof to enter and further damage the Temple. The trial court found that nothing in the contract provided for any work inside the building nor for repair of the downspouts and that all of the work was strictly on the exterior of the building per the contract.
From the evidence presented, we find that the roofing expert, Mr. Cox, testified his firm was asked to inspect the roof. He inspected the roof in 1995 and testified that he found "water standing in several areas, primarily at the down spouts on the east side," which had inadequately sized wire strainers soldered into them and plugged up with debris.
Although Mr. Polk responded in the negative when asked whether as a roofer they were responsible for drains, he subsequently testified that Industrial was responsible for the roof drains that went into the existing roof drain pipe and that Industrial installed "a new roof drain, copper drains into the roof, the existing roof drain pipes."
Clearly, the intent of the Trust by entering into this contract was to stop all leakage. Of equal importance is the uncontradicted testimony of the trustee that discussions were held on the issue of assuring the Trust that the flow of water from the roof to the ground would be complete so that there would be no further leakage. The down spout on the interior serves the purpose of roof drainage. The down spout or drain collects the rainwater from the roof and diverts it to the subsurface drain line which connects to the main line under the street. The Trust reasonably expected and believed that once the contract was complete there would be no further leaks and that rainwater would flow from the roof to the subsurface. Hence, considering the entire record, the evidence shows that the Trust satisfied its burden of proving both the existence and nature of the defects; that the defects were due to faulty materials or workmanship, and proving the cost of repairing the defects, namely, the missing pipe.
Accordingly, we find that poor workmanship resulted in failure of the rain water to flow from the roof preventing further leakage. The evidence presented shows that $375.00 was the cost of installing the missing pipe to properly connect the pipes from the roof. We conclude that the Trust is entitled to recover $375.00.

DENIAL OF MOTION FOR NEW TRIAL
In assignment of error number four, the Trust urges that the trial court erred in denying the Trust's Motion for New Trial as evidence was presented to show that Polk falsely testified that Industrial extended the membrane in the hog valley up to the top of the parapet wall and counter flashed this membrane.
When an appellant has appealed from a final judgment, it is permissible for him to raise and the court to consider in connection with the appeal, complaints relating to the denial of a motion for a new trial. See Piper v. Rabalais, 407 So.2d 751 (La.App. 1st Cir.1981); Belaire v. Vanderbrook, 405 So.2d 1143, 1144 (La. App. 1st Cir.1981), writ denied, 409 So.2d 659 (La.1982).
In the instant case, with respect to the Trust's claim that it should have been granted a new trial, we must disagree. The Trust based its motion for a new trial on the superintendent's testimony regarding the membrane conflicting with that of the expert witness. A review of the evidence presented at the hearing on the motion for a new trial reveals that it was entirely cumulative. Clearly, the trial judge was of the opinion that the evidence presented would not change the outcome of the case. We agree with that assessment. We find no merit to that argument and no manifest error in the trial court's decision.

*942 INCREASE THE SUM AWARDED
In the answer to the Trust's appeal, Industrial seeks an increase in the sum awarded, urging that the trial court erred in reducing the balance due by $1,500.00, attributing the crack in the masonry wall to Industrial.
Industrial further urges that maintenance on the building has been lacking for years, that there is no direct proof of any negligence by Industrial and that there is no proof that loading roofing materials on the roof did in fact cause the crack. Industrial further asserts that witnesses testified that the scaffolding was not attached to the building so as to cause damage and that the Trust seeks to avoid payment of a just and true obligation. In conclusion, Industrial urges that the trial court's ruling, reducing the balance due, should be reversed and judgment rendered in favor of Industrial for Eleven Thousand Forty-Eight and no/100 ($11,048.00) dollars, plus interest and costs, subject to amounts paid.
The trial court found that a crack in the exterior masonry wall of the building resulted in some water seepage and that the crack was in the vicinity of the scaffolding erected by Industrial, thereby attributing the crack in the masonry wall to Industrial and reducing the balance due to Industrial by $1,500.00.
First, in order for the contractor to recover any of the contract price when the contractor has breached a building contract, there must first be a determination of substantial performance by the contractor. Rapides Const., Inc. v. Gaspard, 411 So.2d 81 (La.App. 3rd Cir.1982). If the work has been substantially performed the contract price is reduced by the amount required to complete or perfect the work. Rapides, supra.
Substantial performance means the construction is fit for the purpose intended despite the deficiencies. This determination is a question of fact. Anderson v. Green, 454 So.2d 200 (La.App. 1st Cir.1984). In the instant case, the trial court apparently used this legal principle when it addressed the crack in the masonry wall and the reduction in the contract price. We agree with the trial court's finding. This assignment of error is without merit.
In furtherance, based upon our finding that Industrial breached its contract by not producing the product it contracted to produce and our determination that the Trust is entitled to a damage award, Industrial is not entitled to any credit nor is Industrial entitled to an increase in the sum awarded. Furthermore, any benefits from use of the leaking roof were far outweighed by inconveniences from the roof's defects where the Trust had to suffer with a leaky roof causing aggravation and damages on a continuous basis. We have no problem in determining this is a construction which contains deficiencies requiring reduction in the contract price in an amount required to perfect this work. The judgment of the trial court awarding Industrial the sum of $9,548.00, plus legal interest and all costs is reversed.
This assignment of error is without merit.

DAMAGES
Under La. Civil Code art. 2769, if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he agrees to do it, he is liable in damages for the losses that ensue from his noncompliance with the contract. The general rule as to the measure of damages is the creditor should be awarded the amount of the loss he has sustained, or the gain of which he has been deprived. La. Civ.Code art.1934. The proper measure of damages in this case is therefore the amount necessary to place the Trust in the same position it would have been in had Industrial installed copper hog valleys, extended the membrane in hog valleys up to the top of the parapet wall, counter flashed the membrane, *943 and properly drained the rainwater from the roof. We conclude that the Trust is entitled under the facts of this record to the full sum of $42,075.00 and all costs.
However, because this matter arose and was tried in Shreveport City Court, we are restricted by the $15,000 jurisdictional limit of the Shreveport City Court, La.Code Civ. Pro. 4841 et seq. Therefore, we grant judgment in favor of the Trust for $15,000.00, the maximum allowed under such jurisdictional limitations.

DECREE
For the foregoing reasons, judgment of the trial court is reversed in part, affirmed in part, and amended. Judgment is rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the trial court judgment in favor of plaintiff-appellee, Industrial Roofing & Sheet Metal Works, Inc., against the defendant-appellant, J.C. Dellinger Memorial Trust is reversed and set aside.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the defendant-appellant, J.C. Dellinger Memorial Trust, and against the plaintiff-appellee, Industrial Roofing & Sheet Metal Works, Inc., in the sum of FIFTEEN THOUSAND DOLLARS AND NO/100 ($15,000.000) DOLLARS.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all court costs, trial and appellate, are assessed against Industrial Roofing & Sheet Metal Works, Inc..
Reversed in part, Affirmed in part, and Amended.
NORRIS, C.J., concurs in the result only.
PEATROSS, J., dissents with written reasons.
KOSTELKA, J., dissents for the reasons assigned by J. PEATROSS.
PEATROSS, J., dissenting.
I respectfully dissent.
As is stated in the majority opinion, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. Brown v. Drillers, Inc., 93-CC-1019 (La.1/14/94), 630 So.2d 741; Crigler v. Crigler, 28,085 (La.App.2d Cir.4/3/96), 671 So.2d 1199. A clear and explicit clause of a contract may not be disregarded by the court. Amend v. McCabe, 664 So.2d 1183 (La.1995); Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970). Nowhere in the contract between the parties is it mentioned or specified that the material to be used in the hog valley is to be copper. In the section titled "Base Bid," the contract specifically states, "Apply a new ... roof, hog valley, cant strip,...." In interpreting the plain language of the contract, if the parties had meant to install a "copper hog valley," they would have specified such in the contract.
Although Alternate No. 2 specifically refers to 16 ounce copper valleys, Industrial's superintendent, Lindel Polk, testified that the hog valley and the 16 ounce copper valleys are two distinct roofing terms. The hog valley is like a gutter and is the area below the slanted slate roof which catches the run-off from the slate roof. The copper valleys are pieces of copper installed underneath the actual slate of the roof where the slate meets at the corners or joints. These copper valleys were also described by Randy Hollowell as being placed in between where the slate meets at the different corners.
In addition, the record reflects that installation of a copper hog valley would not be consistent with the roofing trade. Industrial presented testimony that a copper hog valley would be impractical because the configuration of the roof, with its many corners and angles, would require numerous *944 soldered joints. These joints would expand and contract with the weather and lose their integrity in a short period of time if the hog valley was copper. You have no such expansion and contraction with copper valleys. Further, the only evidence that the original hog valley was copper is the self-serving testimony of a trust representative that it was copper. Neither the report of James Mohr nor the contract between the parties specifies the material from which the original hog valley was constructed.
The statement of the trustee of the trust that the deceased A.H. Hollowell said the "valley" should have the same life expectancy as the slate roof is not conclusive that Mr. Hollowell was speaking of the hog valley. The trustee candidly admitted that she thought "copper valley" and "hog valley" were the same thing. It is logical that the copper valleys would need to have the same life span as the slate roof since they are positioned beneath the slate. The slate would have to be removed if the copper valleys were in need of replacement.
As to any leakage damage caused by the hog valley, I do not believe the evidence showed that the source of the leakage was, in fact, from the hog valley or the parapet wall. In addition, there was testimony that the coping stones, which were not included in the contract, were not properly waterproofed. This area was, therefore, a possible source of the leakage.
Furthermore, any alleged water damage to the stained glass window was present before Industrial endeavored to repair the roof. Comparing the photographs taken by Mr. Mohr before the roof repair with the photographs taken by the Trust in 1997, the damage to the window is the same in all photographs. See Plaintiffs exhibit 1, page 10, and Defendant's exhibit 1-N-1 through 1-N-3.
Finally, I find that Industrial's scaffolding did not cause the crack in the upper, southwesterly, outer masonry wall. Again, comparing the before and after pictures, it is plainly evident that the crack was present before Industrial repaired the roof. See Plaintiffs exhibit 1, pages 1 and 2, which depict the front of the Temple and plainly show the crack complained of, compared with Defendant's exhibits 1-F-1, 1-F-2 and 1-F-4, which show the same crack.
For the reasons set forth in this dissent, I would amend the judgment of the trial court to award the full amount sought by Industrial ($11,048) and affirm as amended.

APPLICATION FOR REHEARING
Before NORRIS, WILLIAMS, STEWART, PEATROSS and KOSTELKA, JJ.
Rehearing denied.