CULPEPPER, Judge.
The plaintiff, Hugh T. Bramlette, filed this suit for the balance of $11,301.32 due under a contract pursuant to which he constructed for the defendant, Rufus J. Hebert, certain facilities for the storage of soybeans, rice and other grains. Defendant contends portions of the installation are defective, or were never completed, for which he is entitled to damages totaling $10,637.04, offsetting most of the balance due.
The district judge concluded that although some of the work was defective, “defendant’s neglect to properly place the plaintiff in default and the failure to pay the expenses and labor already incurred, leaves the court no other alternative than to conclude that the plaintiff is entitled to judgment in the full sum of $11,301.32.” Defendant appealed.
We have decided that since the defective installation constituted an active violation of the contract, no putting in default was necessary; and defendant is entitled to damages substantially offsetting the balance claimed on the contract.
The general facts are that by an instrument dated August 4, 1965, and a revision thereof dated September 9, 1965, plaintiff agreed to construct for defendant a dump pit, cleaner, elevator, certain screw conveyors, a large 36' by 40' storage bin, a smaller 7,400 bushel capacity storage bin and certain other accessories. The total contract price came to $31,556.40.
Defendant does not contend that all of the work was defective. His principal contentions relate to the dump pit and the large 36-foot storage bin. As to the dump pit, defendant says its capacity was only 241 bushels, instead of 300 to 350 bushels as specified in the contract. This is important because many grain trucks carry 300 bushels. Also, the concrete work was defective, causing the pit to leak water; the pit was too deep to allow a gravity flow of grain from the pit into the bottom of the elevator; and the conveyor screw in the bottom of the pit was 6" size, instead of 9" as specified. Because of these defects, defendant contends the entire dump pit had to be destroyed and rebuilt.
As to the large 36-foot storage bin, the concrete foundation ring settled, causing the bin to tilt about 3i/£"; the concrete cone in the bottom of the bin was 3" thick instead of 6" as specified in the contract and the cone leaked water; and the metal sides of the bin were not properly anchored to the foundation. The bin had to be jacked up and the entire foundation and floor replaced.
Without discussing the evidence in detail, we find the record clearly supports the defects urged by defendant.
We will first discuss the issue of whether defendant failed to properly put plaintiff in default. After it became apparent that the dump pit and the large storage bin were improperly installed, defendant, of course, objected. Apparently there were some discussions between plaintiff and defendant as to the corrective measures necessary. However, no agreement was reached.
During the spring of 1966, defendant had employed Dupont Manufacturers, Inc. to add some additional storage bins to his complex and to change the location of the 8 bins from a semi-circle to a straight line, to facilitate the conveyance of grain to the bins, a project involving about $75,000. Defendant decided to employ Dupont to do the corrective work on the dump pit. During March of 1966 Dupont removed the dump pit and replaced it with a pit of 420 bushels capacity.
Apparently plaintiff was still making an attempt to correct the large storage bin. On June 13, 1966 he sent 2 men to seal *363 the cone in the bottom of the bin with fibre glass to prevent water seepage. Defendant told these two men that fibre glass would not correct the defects and requested that they stop work.
On June 23, 1966, defendant wrote a letter, received by plaintiff on June 30, 1966, stating that the dump pit and the storage bin were totally unsatisfactory and “the work has to be completed by another contractor, in event that you do not desire to properly complete the same.” The letter further states:
“ * * * I am placing you in default, in that for some unknown reason, you apparently do not intend completing this properly, since this has to be accomplished immediately, I will have the same done by Dupont Manufacturers, Inc., unless, by way of answer from you within five days, you indicate your intention to do the work as is necessary, to properly complete the same.”
On receipt of the above letter, plaintiff made no offer to do the corrective work. Instead, he mailed to defendant on July 13, 1966 a statement for the balance due on the contract. The corrective work on the large storage bin was done by Dupont during August and September, 1966.
From the above brief statements of the facts, it is seen that when the so-called “letter of default” was written by defendant on June 23, 1966, the dump pit (but not the storage bin) had already been removed and replaced by Dupont. It is on this basis that the trial judge held, and plaintiff now contends, there was no proper putting in default. Plaintiff relies on LSA-C.C. Article 2765 which reads as follows:
“The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.”
LSA-C.C. Article 2765 has no application here. That article is concerned with a situation where the proprietor desires to cancel a construction contract before the work is substantially completed. In the present case, the contract was substantially completed but the work was defective. In this situation, the builder can recover the contract price less whatever damages the owner may prove attributable to the breach of contract. LSA-C.C. Article 2769; Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961).
A contract may be breached either actively, by doing something inconsistent with the contract, or passively, by not doing something required. LSA-C.C. Article 1931. In case of passive violation, the debtor must be put in default, LSA-C.C. Article 1933. If the breach is active, no putting in default is necessary. LSA-C.C. Article 1932.
Jurisprudence interpreting LSA-C.C. Article 1932 has established that where work done under a construction contract is defective, or not in accordance with the specifications, there is an active breach of the contract and the proprietor is under no obligation to put the builder in default. Stamm-Scheele Manufacturing Company v. Young, 158 La. 587, 104 So. 377 (1925); Payne & Joubert v. Amos Kent Brick & Lumber Company, 110 La. 750, 34 So. 763; Parkerson v. Home Protection Service, La.App., 24 So.2d 256; Vazquez v. Gairens, La.App., 26 So.2d 319; Jones v. Whittington, La.App., 171 So.2d 764.
In the present case, the defects in installation of the dump pit and the storage bin constituted active breaches of the contract. It was not necessary for defendant to put plaintiff in default. The only possible question is whether defendant’s “letter of default” written on July 23, 1966 had the effect of changing the rights of the parties so that plaintiff now has the same rights as a contractor who passively breached his contract and is entitled to be placed in default. No cases have been cited involving *364 this precise issue. Under the circumstances, it would be highly inequitable to hold that the defendant must be denied damages because he wrote a letter placing the builder in default, when actually no putting in default was necessary.
It is true that when the letter of default was written the dump pit had already been replaced. But, the storage bin had not been corrected and plaintiff made no offer to do this part of the work. The evidence shows that both the dump pit and the storage bin were poorly installed and required extensive corrective work. Certainly the builder should not be excused from this poor workmanship because of the technicality that the proprietor wrote an unnecessary letter putting the builder in default. Furthermore, we fail to see how plaintiff has been prejudiced in any way by the writing of the letter. The corrective work was necessary and the cost thereof appears reasonable.
With only one or two exceptions, the evidence supports the amount of damages claimed by defendant because of defective installation or failure to furnish specified equipment. These may be itemized as follows:
(1) Jeansonne, Wyble and Associates, Consulting Engineers, who inspected the 36-foot storage bin, found the de- ^ fects noted above and recommended the repair work . .$ 200.00
(2) Dupont Manufacturers, Inc., for work done in jacking up the storage bin, replacing the foundation ring and flooring and reinstalling the bin and accessories.$2833.98
(3) Grimmett, Janes & Traylor, Inc., for ready-mix concrete and sand for the unloading pit and storage tank.$2547.63
(4) Stelly Lumber Yard, for lumber, wire mesh, reinforcing rods, etc. for the dump pit and storage bin .$ 539.07[1]
(5) Dupont Manufacturers, Inc. for removing the dump pit and replacing it .$2759.95 [2]
(6) Credit for cost of installation of a 9" screw conveyor, 25' long, which was specified in the contract and delivered to the jobsite but not installed ..$ 172,00
TOTAL.$9,052.63
An additional item of damages claimed by defendant is $1260 for an unloading auger and accessories for the large storage bin, which equipment was not furnished or installed. This is shown on the September 9, 1965 addition to the contract, Tr. 364, as being “one 6 inch unloading auger, complete with motors, sheaves, drives, * * A separate price is not given in the contract for this unloading equipment, it being *365 included in the total price of $10,000 for the large storage bin.
Plaintiff admits this unloading auger was never furnished or installed. He explains that since there was a possibility the foundation of the storage bin would have to be replaced, he did not install the unloading auger. The cost of this unloading equipment is estimated by plaintiff at $300. In his statement for the balance due on the contract price, he gives defendant credit for this $300. Defendant says that a 6" auger is not adequate and that he actually anticipated a larger unloading system which would cost $1260.
The contract is clear in that it specifies only a 6" unloading auger for the storage bin. Defendant’s proof as to the cost of unloading equipment has reference to much larger augers. Hence, plaintiff has failed to prove this item of damages with the degree of certainty required by law. We therefore disallow it.
Summarizing, the balance due plaintiff on the contract is $11,301.32. The total damages due defendant for breach of contract amount to $9052.63. Plaintiff is entitled to judgment for the difference between these two figures, i. e., the sum of $2248.69.
Since defendant has been substantially successful on this appeal, all costs must be assessed against the plaintiff.
For the reasons assigned, the judgment appealed is amended, reducing the amount of the judgment in favor of plaintiff from the sum of $11,301.33 to the sum of $2248.-69, together with legal interest thereon from date of judicial demand until paid. All costs in the lower court, as well as the costs of this appeal, are assessed against the plaintiff appellee.
Amended and affirmed.

. Exhibit D-4, Tr. 369, is a letter from Stelly Lumber Yard stating that it furnished wire mesh and reinforcing rods to defendant in the sum of $209.30. Exhibit D-10, Tr. 375, is a group of the actual delivery tickets for items delivered by Stelly Lumber Yard to defendant, totaling $539.07. As we understand defendant’s testimony, Tr. 355-358, the delivery tickets were obtained to substantiate Stelly’s statement, D-4, in the sum of $209.30, which amount is included in the total of the delivery tickets.

. Defendant’s Exhibit D-5, Tr. 370, is Dupont’s invoice in the sum of $3,033.90, but this admittedly includes an item of $273.95 for removing an overhead screw conveyor to change the arrangement of the storage bins, which work was not necessitated by any defect in the 36-foot storage bin. Defendant admits this item of $273.95 should not be charged to plaintiff.