968 So.2d 844 (2007)
Rodric CASCIO and Sue Ellen Cascio, Plaintiffs-Appellants
v.
Henry Hays CARPET and Decorating, LLC, Defendant-Appellee.
No. 42,653-CA.
Court of Appeal of Louisiana, Second Circuit.
October 24, 2007.
*846 Donald L. Kneipp, Monroe, for Appellants.
Hayes, Harkey, Smith & Cascio, by Thomas M. Hayes, III, Monroe, for Appellee.
Before STEWART, PEATROSS and LOLLEY, JJ.
STEWART, J.
In this breach of contract case, Dr. Rodric Cascio and his wife, Sue Ellen Cascio, ("the Cascios") appeal a judgment denying their claim for damages due to the failure of the defendant, Henry Hays Carpet and Decorating, L.L.C., ("Henry Hays") to install wood floors in a workmanlike manner or to remedy the defects. Finding no manifest error in the trial court's judgment, we affirm.

FACTS
On April 8, 2003, the Cascios contracted with Henry Hays for the purchase and installation of brick-style pavers in the kitchen and breakfast areas of their home and wood flooring in their living room, dining room, foyer, hall, and utility room. The total contract price was $19,920.94. The Cascios paid $9,960.47 upon signing the contract. No specifications were provided in the contract, other than the flooring material to be used and the requirement that Henry Hays pull up the existing flooring.
Henry Hays' installer, Matt Marble, began the job shortly after the contract was signed and last worked on or about May 22, 2003. The Cascios were unhappy with the finished product and the time it took to complete the installation. They did not like the three-quarter inch round shoe molding used to trim the area between the floor and baseboards and claimed that this molding, rather than their preferred one-quarter inch molding, was required due to excessive gaps left between the wood planks and baseboards. They also complained that the door jambs and plinth *847 blocks were cut too high and that thresholds and trim around the fireplace and stairs were not installed in a workmanlike manner. The Cascios noticed gaps between and at the ends of planks, and they found hollow spots where the wood planks did not adhere to the slab.
When Henry Hays was unable to remedy the defects to the Cascios' satisfaction, they filed suit on October 13, 2003, alleging breach of contract and seeking the return of what they had already paid, the cost to remove and replace the flooring, damages for emotional distress and mental anguish, as well as attorney's fees and costs. Henry Hays filed a reconventional demand seeking the balance of $9,960.47 due on the contract and alleging the work was done properly. The matter proceeded to a bench trial.

Trial Testimony
According to the Cascios, they decided to replace the floors in their downstairs living area after an overflow drain in an upstairs bathroom malfunctioned and caused water damage to the wood floors in their foyer. Though the Cascios ultimately contracted with Henry Hays, Dr. Cascio testified that they first selected the wood flooring they liked, a Harris-Tarkett engineered wood product in a Brazilian cherry finish, at another store. The finish was their only consideration in selecting the new wood floor.
The Cascios told Donna Bonnette, a Henry Hays salesperson, that they wanted everything to be exactly the same. She assured them that it would look the same and even better. Bonnette told them the work would take eight to ten days and that Henry Hays' best installer would be on the job.
The work began sometime between April 9, 2003, and April 14, 2003. The installers moved the Cascios' furniture and tore out the old wood floor that had been glued down to the slab before installing the new floors. Dr. Cascio described the "horrible, filthy, awful" conditions they endured while the work was underway-furniture crammed in rooms, splinters on the floors, stickiness, having to hop across the rooms on carpet squares, and dust everywhere. They were unable to park their cars in their garage during this time because materials and supplies were stored there. The prolonged installation process interfered with plans for a number of family events, including their son's confirmation and eighth grade graduation, their daughter's kindergarten graduation, and Mrs. Cascio's mother's birthday and fiftieth wedding anniversary. However, the Cascios' testimony indicated that some of these events may have occurred during the early days of the installation and some as late as July.
During the installation of the wood floors, Mrs. Cascio noticed that some planks were not sticking to the slab. Problems also arose due to the new flooring being thicker than the original floors in the Cascio home. Wherever the new flooring met another material, such as at thresholds between rooms and at the marble tiles surrounding the hearth, wood trim had to be installed as a transition, whereas the original wood floor had been installed flush with the other flooring materials and the marble hearth. Dr. Cascio testified that the trim work was poorly done. Some of it broke repeatedly, and the plinth blocks were cut too high. Molding was left unpainted and glue residue was left behind. The Cascios had previously had quarter-inch round shoe molding where their six-inch baseboards met the old floors. However, three-quarter inch shoe molding was installed to cover the gap between the new flooring and the baseboard. The Cascios found the larger shoe molding, which was a half an inch higher *848 on the baseboard than the old molding, to be out of proportion to the baseboard and aesthetically unappealing. It was also improperly installed, glued to the slab in one area, and not even attached in some areas. Lastly, the Cascios noticed both hollow spots and some gaps where the ends of the planks met and between the planks. Photographs of the poor trim work and of credit cards propped between the gaps were introduced into evidence.
To address the problems with the installation, Mrs. Cascio met with Donna Bonnette, Paula Lyles, who was another Henry Hays employee, and Irene Sartori of Bolick, the Harris-Tarkett distributor. Though the Cascios agreed to allow five additional days for the installer to remedy the problems, nothing was completed to their satisfaction. No additional work was done after May 22, 2003. Dr. Cascio's testimony on cross-examination established that most of the deficiencies could be repaired. However, the Cascios rejected an offer by Henry Hays of $1,500 off their balance to have the repairs made.
At the Cascios's request, Chris Sullivan, the carpenter who had done the trim work when their house was built, gave an estimate of $1,300 to replace the three-quarter inch round shoe molding with quarter inch molding and to replace the plinth blocks and T-molds at doorways. Sullivan recommended placing new marble tiles over the existing marble to make the hearth flush with the floor. However, none of the work was done. When Sullivan attempted to replace the shoe molding, the smaller size did not cover the gap between the edge of the floor and the baseboard. Sullivan testified that he had used the smaller shoe molding on floors of similar thickness to that installed in the Cascios' home, and he believed that the new flooring would have to be completely removed and replaced in order to correct the deficiencies. However, Sullivan had no expertise in floor installation and no familiarity with the Harris-Tarkett flooring.
When Donna Bonnette went to the Cascios' home to measure the job, she informed Mrs. Cascio that transition pieces would be required at the hearth and at doorways where different flooring materials met. Although Mrs. Cascio said that her husband did not want transitions, they accepted the bid with the understanding that the job was not feasible without them. Bonnette admitted that she never discussed the size of shoe molding with the Cascios. She testified that the size of shoe molding had never been an issue with customers. Bonnette recalled that another Henry Hays employee went over the specifications of the Harris-Tarkett flooring with Mr. Cascio at the store. According to Bonnette, the smaller shoe molding could not be used due to the thickness of the new floor which required at least a half inch gap at the perimeter. She testified that small gaps between and at the ends of planks are not uncommon and not indicative of poor installation. She believed that Matt Marble was competent to do the installation even though he may not have installed the Harris-Tarkett flooring before the Cascio job.
Although Bonnette told the Cascios that the work should take eight to ten days, she testified that this time period did not include the removal of the old floors, which were tough to get up and took longer than expected. She also attributed delays to Mrs. Cascio, who asked that they not work during a few days of heavy rain and that the installers be out of the house by 3:00 p.m., when the children returned from school. Further delay occurred due to the Cascios' disapproval of the method used to repair hollow spots in the floors by drilling a small hole and injecting epoxy *849 under the wood. They demanded that the planks be removed and new ones installed.
Paula Lyles, a manager at Henry Hays, denied the Cascios' claim that she intimated that Marble was not qualified to do the job. Lyles explained that she told the Cascios that Marble was not the only installer Henry Hays used and that he may not have previously installed the flooring they chose. Lyles recognized some problems with the trim, particularly cracks in the trim surrounding the hearth and at thresholds that needed replacement. She believed that the Cascios should have been told that larger shoe molding would be required with the floors.
The deposition of Irene Sartori, a sales representative of Bolick, the distributor of the Harris-Tarkett flooring, was introduced into evidence. From her visit to the Cascios' home, Sartori found that the flooring looked beautiful, though she noticed one spot that may have been cut too far from the wall. She described the Harris-Tarkett product chosen by the Cascios as an engineered material consisting of different plies glued together with a veneer on top. Each plank was eight feet long, seven and a half inches wide, and nine-sixteenth of an inch thick. Sartori explained that the longer planks were harder to glue down, but anyone with experience installing wood should be able to do the job. She suggested that expansion and contraction of the flooring and imperfections in the slab, rather than poor installation, might have caused the gaps between the planks. As explained by her, the thickness of the floor required at least a one-half inch gap around the perimeter of the floor, and covering the gap required shoe molding larger than what the Cascios originally had. Although she would have made the Cascios aware that larger shoe molding would be needed, Sartori had never heard a customer and salesperson discuss the size of shoe molding. She explained that customers are usually more concerned with the aesthetics of the wood floor. Finally, Sartori agreed that the installers used the standard method to correct hollow spots in the floor by drilling a small hole into which epoxy could be injected.
The Cascios had Keith Young, the installer of their original floors and owner of a floor covering business, examine the new floors. Young did not agree that the floors would have to be replaced. Rather, he noted a few problems that were easily correctable. Young testified that the Henry Hays installers used the industry accepted standard for repairing hollow spots by injecting an adhesive through an inconspicuous hole drilled in the floor. He explained that a gap of at least one-half inch is usually required around the perimeter when installing wood floors so as to allow for expansion of the material. He noted that manufacturers usually specify an even larger gap and that the warranty may be voided if such specifications are not followed. Young stated that he always discusses transition materials with customers but that he did not recall any customer asking about shoe molding size.
Matt Marble installed the new flooring in the Cascios' home. He testified that he had seven years of installation experience and that, while he had installed long planks before the Cascio job, he had not previously installed the particular material they selected. However, he knew what he was doing and that a gap of one-half inch for expansion was required for the wood flooring. Marble explained that a one-half inch gap did not allow for replacement of the Cascios' desired shoe molding nor did it even allow for placement of a one-half inch round shoe molding. Marble's crew averaged three people a day, and they usually stopped working around 2:00 or *850 3:00 in the afternoon when they began to feel unwelcome. He believed that six weeks for a job the size of the Cascio job was not unrealistic. He described the removal of the old flooring, which came up in splinters, as difficult. With regard to the Cascios' other complaints, Marble did not recall leaving any shoe molding unattached or glue residue on surfaces. He noted that gaps between and at the ends of planks will occasionally happen and that the gaps are usually filled with wood putty. He had no prior experience working with molding like that he installed around the hearth, and he recalled repairing it at least one time. He believed the plinth blocks could be repaired with Dap and paint. Marble explained that he did not return to make further repairs due to the dispute between Henry Hays and the Cascios.
Larry Johnson, the owner of Henry Hays, testified that the Cascios owe a balance of $9,960.47. He recalled that the Cascios were not happy with the trim work. Johnson visited the Cascio home with the attorneys involved in their litigation and found the workmanship on the floors to be of acceptable quality. He stated that Marble had installed wood floors for him before the Cascio job and that he was a reputable and qualified installer.
The trial court found that Henry Hays had substantially performed its contractual obligations but that the trim work was not completed in a workmanlike manner. Thus, the trial court denied the Cascios' claim for the full contract price but awarded a deduction of $2,050 from the balance owed. Henry Hays was awarded $7,910.47, the amount due on the contract minus the deduction awarded the Cascios. Finding that the nature of the property problem did not support an award for emotional distress or mental anguish damages, the trial court denied that part of the Cascios' claim. The trial court did not award either party attorney's fees or costs. The Cascios' appeal followed.

DISCUSSION
The Cascios challenge the trial court's finding that the floor installation was completed in a workmanlike manner. They argue that they should have been awarded the full contract price as damages to place them in the same position as if the contract had been fulfilled.
The basis of the Cascios' claim is La. C.C. art. 2769, which states:
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
A contractor is obligated to perform the work in a good and workmanlike manner so that the work is suitable for its intended purpose and free from defects in material and workmanship. Allstate Enterprises, Inc. v. Brown, 39,467 (La.App.2d Cir.6/29/05), 907 So.2d 904; Mount Mariah Baptist Church v. Pannell's Associated Electric Co., 36,361 (La.App.2d Cir.12/20/02), 835 So.2d 880, writ denied, XXXX-XXXX (La.5/2/03), 842 So.2d 1101. To establish the contractor's liability for damages due to defective workmanship, the owner must prove the existence and nature of the defects, that the defects are due to faulty materials or workmanship, and the cost of repairing the defects. Mount Mariah, supra; Industrial Roofing & Sheet Metal Works, Inc. v. J.C. Dellinger Memorial Trust, 32,048 (La. App.2d Cir.8/20/99), 751 So.2d 928, writs denied, 99-2948 and 99-2958 (La.12/17/99), 752 So.2d 166; Austin Homes, Inc. v. Thibodeaux, XXXX-XXXX (La.App. 3d *851 Cir.5/8/02), 821 So.2d 10, writ denied, 2002-2324 (La.11/15/02), 829 So.2d 436.
If the owner meets the burden of proof, the remedy is to reduce the contract price in an amount necessary to perfect or complete the work according to the terms of the contract. Mount Mariah, supra; Moore v. Usrey & Usrey, 52 So.2d 551 (La.App. 2d Cir.1951). However, a contractor may still recover part of the contract price, notwithstanding defects, when substantial performance is shown. Mount Mariah, supra; Industrial Roofing, supra. Determination of substantial performance is a question of fact about whether the construction is fit for its intended purpose despite deficiencies. Mount Mariah, supra. Factors that may be considered in determining whether the contractor achieved substantial performance include the extent of the defects or non-performance, the degree to which the purpose of the contract has been impaired, the ease of correction, and the use or benefit to the owner of the work performed. Id.
The trial court's factual findings may not be set aside in the absence of manifest error or unless clearly wrong. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La. 1990). Where there is conflicting testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed by the reviewing court. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the trier of fact's choice between them cannot be manifestly erroneous or clearly wrong. Id.
Although the Cascios claim the defects they complain of show that Henry Hays failed to perform the floor installation in a workmanlike manner, the trial court rejected their claim for recovery of damages to replace the entire wood floor and determined that Henry Hays had substantially performed its contractual obligation. However, the trial court did find that the defective trim work would require repair and/or replacement and awarded the Cascios a reduction in the contract price. The record supports the trial court's factual findings and judgment.
There was no credible testimony to support the Cascios' claim that the floors were improperly installed and would have to be removed and reinstalled to correct the alleged deficiencies. The trial court rejected the testimony of Chris Sullivan, who testified that the floors would have to be removed and replaced. Sullivan, a trim carpenter, had no experience in floor installation. Keith Young, who had installed the original floors in the Cascios' home, disagreed with Sullivan's assessment and testified that the defects he observed were easily correctable. The gaps between and at the ends of planks were not shown to be a defect indicative of unworkmanlike installation. Rather, the testimony established that such gaps, which were attributed to imperfections in either the engineered planks or the slab, are not always avoidable. Additionally, the record shows that Marble attempted to repair the hollow spots complained of using a commonly accepted method and then removed and replaced some planks to satisfy the Cascios. Any remaining hollow spots were not shown to constitute a defect requiring replacement of the wood flooring.
The other deficiencies related to trim work. The Cascios' primary complaint was about the size of the shoe molding required to cover the gap left between the end of the planks and the baseboards. Though they alleged the gap was excessive, this claim is not supported by the record. The Cascios testified that they selected the Harris-Tarkett flooring for its finish. They sought an estimate for the Harris-Tarkett flooring from Henry Hays *852 and did not ask about its specifications. They testified that they told Donna Bonnette that they wanted everything exactly the same, but there was conflict in the testimony as to what was discussed about transitions needed with the new flooring and whether Dr. Cascio was told about its thickness. There was no meeting of the minds as to what "exactly the same" meant in the context of a new flooring. The record establishes that the thickness of the Harris-Tarkett flooring meant that it would be impossible to replace the Cascios' preferred smaller shoe molding after installation. Although the Cascios may have chosen a different flooring had they known that a larger shoe molding would be required, the failure to communicate cannot be attributed solely to Henry Hays. Keith Young, Irene Sartori, and Paula Lyles testified that customers should be told about changes in molding. However, the testimony also established that the size of shoe molding is not typically discussed and not something on which most customers base their flooring decisions. We note that the contract between the parties did not specify the size of shoe molding to be replaced and did not even address trim work. Considering the totality of the evidence, we do not find that the installers left an excessive gap around the perimeter of the flooring or that use of a larger size of shoe molding to cover the gap constitutes a breach of contract.
The record supports the trial court's finding of substantial performance by Henry Hays. Despite some deficiencies, the flooring was not shown to be unsuitable for its intended purpose. While the trial court found that the trim work was not done in a workmanlike manner, the record shows that the poor quality work can be corrected. The Cascios got an estimate of $1,300 for repairs from Sullivan, and Henry Hays offered them $1,500 off the contract price for repairs. Taking these amounts into account and considering the work to be done to correct the deficiencies, the trial court awarded the Cascios $2,050 off the contract price on their demand for damages. We find no abuse of discretion in the award. Reviewing the record as a whole, we cannot say that the trial court's finding of substantial performance by Henry Hays and failure to award the Cascios the full amount under the contract is manifestly erroneous or clearly wrong.
The Cascios also argue that the trial court erred in failing to award nonpecuniary damages for emotional distress and mental anguish. Under La. C.C. art. 1998, nonpecuniary damages may be awarded when the nature of the contract was intended to gratify some nonpecuniary interest and, because of the circumstances surrounding the formation of the contract or the nonperformance, the obligor knew or should have known that nonpecuniary loss would result from the failure to perform. Nonpecuniary damages may also be recovered when the obligor intended the nonperformance to aggrieve the feelings of the obligee. La. C.C. art.1998. Whether the principal object of a contract was intended to gratify some nonpecuniary interest is a question of fact, and the decision of whether to award damages is within the trial court's discretion. Stonecipher v. Mitchell, 26,575 (La.App.2d Cir.5/10/95), 655 So.2d 1381.
The trial court denied the claim for nonpecuniary damages upon concluding that the Cascios' property problem was not of the type to support an award for emotional distress or mental anguish damages. The record does not show that the installation contract had the satisfaction of some nonpecuniary interest as its principal object. Rather, the decision to get new flooring *853 stemmed from damage caused by an overflow in an upstairs bathroom.
Although Dr. Cascio testified that what they experienced during the installation was more than a mere inconvenience, the living conditions he described do not appear so unusual or unexpected for a job involving the removal of a significant amount of wood flooring glued to a slab and the installation of new flooring in the main living areas of the home. The Cascios complain that the work lasted longer than the eight to ten days they were told by Donna Bonnette, but their contract did not provide a time period. The installer, Matt Marble, testified that six weeks was not unreasonable for the job, and the trial court found him to be a credible witness. Bonnette clarified that her estimate did not take into account the removal of the wood floors which was, as testified to by Marble, more difficult than expected.
We also find no basis for awarding damages to compensate the Cascios for their disappointment in not hosting family celebrations at their home. It appears from the record that the Cascios knew some of the events would not be able to be held at their home due to the scheduled installation. Others, such as the mother-in-law's birthday and anniversary, occurred months after the installers quit working. The trial court found substantial performance by Henry Hays; therefore, the flooring was fit to serve its purpose despite the poor quality work on the trim. The Cascios' decision to close their house to family celebrations because of their dissatisfaction with the trim work does not support an award of nonpecuniary damages.
We find no abuse of discretion in the trial court's denial of damages for the inconveniences suffered by the Cascios during the installation process even though it lasted longer than they expected and interfered with plans for family celebrations.

CONCLUSION
Finding no manifest error, we affirm the trial court's judgment. Costs of appeal are assessed to the Cascios.
AFFIRMED.