# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1256


SHERRI TRANSIER

VERSUS

BARNES BUILDING, LLC, ET AL.


**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 21503
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
### JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Phyllis M. Keaty, Judges.


**PETERS, J., concurs in the result.**


### AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

**Richard A. Rozanski**
**Stephen D. Wheelis**
**Shawn M. Bordelon**
**Wheelis & Rozanski, APLC**
**Post Office Box 13199**
**Alexandria, Louisiana  71315-3199**
**(318) 445-5600**
**Counsel for Plaintiff/Appellant:**
       **Sherri Transier**

**Herman M. Savoie, Jr.**
**Attorney at Law**
**Post Office Box 712**
**Alexandria, Louisiana  71301**
**(318) 448-8002**
**Counsel for Defendants/Appellees:**
       **Michael Barnes**
       **Barnes Building, LLC**

**KEATY, Judge.**

The plaintiff/homeowner, Sherri Transier, appeals a judgment rendered in favor of the defendant, Barnes Building, LLC, and against her in the amount of $1,443.85 after the trial court offset awards in favor of each of them in this dispute over a construction contract. For the following reasons, we affirm in part, reverse in part, and render.

## FACTS AND PROCEDURAL HISTORY

Michael Barnes, the owner of Barnes Building, LLC, submitted a Bid/Proposal to Transier regarding the construction of a home for her according to plans that had been drawn by James Foster, a draftsman. While the original plans that Barnes reviewed contained a second floor, because of Transier's financial constraints, the final plans had been modified to provide for a single-story home with the notation that proper floor joists be provided for a future second story.[1] Transier signed and accepted the bid on March 28, 2010. The bid listed the total cost of labor and materials for the project as $323,500.00 to be paid in five installments of $62,700.00, which became due at specified stages in the construction, plus a final payment of $10,000.00 upon completion.

Transier paid the first installment on April 13, 2010, before construction began, and the second installment on May 12, 2010, when the foundation was poured. At trial, Transier testified that during phase two of the construction, she became concerned after noticing dips and valleys in the metal roof and irregular overlapping and gapping in the roof's metal sheeting where it appeared to have been forced together. She stated that when she expressed her concerns to Barnes,

---

[1] The notation read: FUTURE 2ND FLOOR EXPANSION – PROVIDE PROPER FL. JST.

he was dismissive and insisted that the roof was structurally sound and would look better once he was finished with it. Nevertheless, Barnes arranged for Transier to meet him at the construction site with Bernard Mayeaux, whom he had hired as the inspector for the project. Transier testified that Mr. Mayeaux concurred with Barnes' assessment that the home's roof, framing, and bracing were fine and that Mr. Mayeaux signed a report saying the home's framing passed inspection.

After the meeting with Barnes and Mr. Mayeaux, Transier hired Charles Sandifer, a certified building official with the Kisatchie-Delta Regional Code Compliance Office, to inspect her home to determine whether any local or state construction codes had been violated. Mr. Sandifer inspected the property on July 20, 2010, and found eighteen violations, most of which concerned the ceiling joists and rafters being overspanned, which he noted in an inspection report wherein he determined that the home failed inspection.

On July 23, 2010, Barnes sent Transier a letter insisting that the home was "beyond the black in stage," which triggered her responsibility to pay the third installment of the contract. Barnes noted that the amount due on the third draw had been adjusted to subtract the door allowance and to account for change orders for the windows, for Styrofoam insulation, for electrical materials and labor, for a different gauge of metal for the roof, and to cover the cost of materials and labor for installation of the metal roof. In total, Barnes sought payment of $97,219.65, which he demanded that Transier pay within three days of her receipt of his letter. He suggested, however, that Transier withhold $2,000.00 of the requested amount until she was "one hundred percent (100%) satisfied." Finally, Barnes informed Transier that if she wanted to use Versavent-brand ridge vents for the roof, he would need an additional advance payment of $850.00.

2

Transier mailed a copy of Mr. Sandifer's inspection report[2] to Barnes on July 26, 2010, "formally requesting" that Barnes provide her with a written proposal of how he intended to remedy the code violations within three days of receipt of her letter. Transier explained that because their contract called for the first five payments to be made in advance of any labor and materials to be provided, she would not tender the third draw to Barnes until the existing construction was blacked-in,[3] met or exceeded all applicable building codes, and received a passing inspection by an inspector of her choosing. Transier asked Barnes to provide her with receipts for all of the materials and contract services that had been purchased to date, along with proof of payment for all employee labor that had been utilized. She also sought the specifications related to the materials that Barnes had purchased for the home, explicitly requesting the engineered truss drawings, the paint and metal warranties for the metal roof, and the load capacity of the engineered floor joists,. Transier insisted that she did not want the door allowance removed from the contract and that she would pay any additional costs directly to the merchant upon arrival as they had previously discussed. Finally, Transier told Barnes that while she did want him to use Versavent ridge vents, he should postpone completion of the roof "until all code deficiencies are satisfactorily addressed."

By letter dated July 29, 2010, Barnes advised Transier of how he proposed to remedy each code violation. With regard to the engineered floor joists, Barnes

---

[2] The inspection report referenced the specific sections of the 2006 International Residence Code, the 2006 International Mechanical Code, the 2008 National Electrical Code, and the 2000 Louisiana State Plumbing Code with which the construction failed to comply.

[3] In the letter, Transier referred to the Louisiana State Licensing Board's website which defined "blacked-in" as "[i]n the dry" and "[w]aterproof" and at the "state of home construction . . . when the following have been completed: framing, exterior doors, windows, electrical rough-in, HVAC rough-in, house wrap, . . . and felt paper on the roof."

noted that he was waiting to receive data regarding the load capacity from the truss manufacturer but that he had been assured, by phone, "that there is no problem." Barnes offered to meet with Transier and her inspector after he had completed the remedial work and that he would "then make all necessary corrections." In the letter, Barnes stated, "I did not design your home, I am trying to satisfy your requirements for future expansion."

On August 2, 2010, Bob Meeker, a building official with the Grant Parish Permit Office, issued a Stop Work Order instructing that work on Transier's residence immediately cease after inspecting the property and concurring with Mr. Sandifer's report. The next day, Transier informed Barnes that she accepted his proposed remedies except for Items #2 and #9, relating to the overspanned roof rafters. Transier explained that she had met Mr. Meeker and Mr. Sandifer at the construction site and that they told her that Barnes should have used two-by-ten rather than two-by-six rafters. She further noted that Barnes' proposal to supplement the originally installed two-by-six rafters with additional braces was unacceptable to her because that would reduce the size and functionality of her future upstairs expansion. Barnes then retained Foy Gadberry, a structural engineer and building official, to review Mr. Sandifer's inspection report and make recommendations on how Barnes could resolve the violations noted therein. Upon inspecting the construction site, Mr. Gadberry agreed with most of Mr. Sandifer's findings.

Thereafter, Transier and Barnes secured legal representation, and attempts were made to commence remediation of the code violations and resume construction on Transier's home, but to no avail. According to correspondence exchanged between their attorneys, Barnes was "willing and able to begin repairs"

4

if the "Cease and Desist Order"[4] was lifted. However, Transier had been told by Mr. Meeker that Barnes had to correct the code violations and the home had to receive a passing inspection before the Stop Work Order would be lifted. Barnes never returned to the construction site, testifying at trial that he did not do so because of nonpayment and fear of arrest. As a result, Transier obtained a contractor's license and a building permit in her own name and subcontracted out for the repair of the existing code violations and the completion of her home. In the meantime, Transier filed an Incident Report against Barnes with the Grant Parish Sheriff's Office on September 30, 2010. She alleged that Barnes had embezzled funds that she had given him for the construction of her home. She further alleged that after being informed that Mr. Sandifer found eighteen code violations upon inspection of the home's framing, Barnes abandoned the construction and left the home "in an unsuitable condition and exposed to the weather." According to the Incident Report, Transier had recently received demands from a roofing company and an electrical supply company that Barnes had used, seeking immediate payment of a total of $14,438.02.

Transier filed a petition for damages against Barnes on May 6, 2011, wherein she alleged that he was guilty of bad-faith breach of contract and fraud. She sought damages to cover the expenses that she incurred in correcting the code violations, which she estimated to total $65,361.49, as well as an amount to compensate her for the emotional distress suffered as a result of Barnes' actions. Barnes filed an answer and reconventional demand in which he claimed that Transier had breached the contract by failing to pay for work he did during the

_____

[4] For purposes of this opinion, we assume that Barnes' attorney was referring to the Stop Work Order when he used the phrase "Cease and Desist Order."

5

third phase of the construction totaling $97,219.65. Thus, Barnes claimed that any award to Transier should be offset by that amount.

The matter proceeded to a bench trial on March 26, 2014. Testimony was elicited from both Transier and Barnes, as well as from Mr. Foster, who drafted the house plans; Mr. Meeker, the building official who issued the Stop Work Order; Mr. Lane Howell, the carpenter whom Transier hired to bring the construction to code; Mr. Sandifer, whom Transier called as an expert building code inspector; and Mr. Gadberry, whom Barnes called as an expert structural engineer and building official. By agreement of the parties, the evidence remained open for the taking of the deposition of Andy Mason, a former contractor who Transier hired to repair her roof. After receiving Mr. Mason's deposition, the trial court issued written reasons for judgment on May 1, 2014. The trial court found that Transier was entitled to $33,686.15 in damages for the expenses she incurred in curing the deficiencies noted in Mr. Sandifer's inspection report. It further found that Barnes was entitled to $35,130.00 in damages on his reconventional demand. After offsetting those amounts, the trial court determined that Barnes was entitled to judgment against Transier in the amount of $1,443.85. Finally, the trial court directed the parties to bear their own costs "[g]iven the mutual breaches" of contract that it found to have been committed by each of them. Written judgment was signed on July 18, 2014.

Transier timely appealed and is now before this court asserting that the trial court erred in the calculation of damages due her as a result of Barnes' breach of contract. She further submits that the trial court erred in finding that the floor trusses installed by Barnes were sufficient to support an upstairs bedroom. She additionally contends that the trial court erred in not awarding her non-pecuniary damages. With regard to Barnes' reconventional demand, Transier contends that

6

the trial court erred in finding that Barnes met his burden of proof and in calculating the damages due Barnes for the work he performed under the contract.

## STANDARD OF REVIEW

> To reverse a factfinder's determination under [the manifest error] standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. *Stobart v. State, Department of Transportation and Development,* 617 So.2d 880, 882 (La.1993). Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Id.* If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* at 882-883.
>
> . . . Although deference to the factfinder should be accorded, because appellate courts have a constitutional duty to review both law and facts, they have the right and the obligation to determine whether a trial court verdict is clearly wrong based on the evidence, or clearly without evidentiary support. [*Ambrose v. New Orleans Police Department Ambulance Service,* 93-3099 (La. 7/5/94), 639 So.2d 216].

*2 S Sign Co., Inc. v. Keller*, 14-47, pp. 2-3 (La.App. 3 Cir. 5/7/14), 139 So.3d 552, 554 (quoting *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408, 09-1428, pp. 12-13 (La. 3/16/10), 35 So.3d 230, 239-40).

"Absent an abuse of discretion, an appellate court will not disturb a trial court's assessment of damages." *Mayerhofer v. Three R's Inc.*, 597 So.2d 151, 155 (La.App. 3 Cir.), *writ denied,* 600 So.2d 680 (La.1992). Accordingly, we will review the trial court's findings as to whether Transier and Barnes proved their entitlement to damages under the manifest error standard, and we will review the

7

appropriateness of the amount of damages awarded under the abuse of discretion standard.

## LAW

"It is implicit in every building contract that the contractor's work be performed in a good, workmanlike manner, and free from defects in materials or work." *Henderson v. Ayo*, 11-1605, p. 5 (La.App. 4 Cir. 6/13/12), 96 So.3d 641, 645.

> Under Louisiana law, the owner of a construction project has the statutory right to terminate a contract to build even though the contractor has commenced work on the project. La. Civ.Code art. 2765; *Oscar Daste & Sons, Inc. v. Dobard,* 516 So.2d 1331, 1335 (La.App. 4 Cir. 12/15/87), *writ denied,* 520 So.2d 743 (La.03/11/88). However, the owner of the construction project must pay the contractor for his completed work. *Id.; Dugue v. Levy,* 114 La. 21, 37 So. 995, 999 (12/05/1904). On the other hand, if the contractor fails to do the work he has contracted to perform, or does not execute in the manner agreed to he is liable in damages for losses that may ensue from his noncompliance with the contract. La. Civ.Code art. 2769.

*Id.* (footnotes omitted).

## I. <u>Damages Due Transier</u>

In its reasons for judgment, the trial court determined that "there were mutual breaches of the building contract by the parties." As Barnes did not appeal the judgment, the finding that Barnes breached the construction contract and, thus, owes damages to Transier is established for purposes of this appeal.

### A. *<u>The Floor Trusses</u>*

Transier submits that the trial court erred in finding that the floor trusses Barnes installed were sufficient to support an upstairs bedroom and in not awarding her damages for the costs she incurred in installing additional trusses. Barnes counters that the evidence supports the trial court's finding that Transier failed to prove that "there was a clear understanding between the parties that the

house would be constructed with a possible second floor expansion suitable for any conceivable purpose."

At trial, Mr. Sandifer testified that floor joists for sleeping areas need to have a higher PSF[5] rating than those used for attics. Mr. Sandifer explained that the spacing on the floor joists that Barnes installed generated a 35 PSF live load and a 10 PSF dead load on the joists, but that the code required that floor joists for bedrooms carry a 40 PSF live load and a 10 PSF dead load. As a result, the floor joists had to be changed in order for Transier to have a bedroom on the second floor. However, in a letter to Transier dated October 26, 2010, Mr. Sandifer wrote that the 2006 International Residence Code specified that a "30 psf live load and 10 psf dead load is only acceptable for sleeping areas and attics" and that the original truss drawings for her home were rated for "35 psf live load and 10 psf dead load." At trial, Mr. Gadberry testified that the trusses were code compliant for attic space but not for habitable space, which would necessitate the installation of additional floor joists. On the other hand, according to Mr. Sandifer's inspection report and a letter that Mr. Gadberry sent Barnes on August 16, 2010, the existing floor joists appeared to be acceptable or adequate.

In its reasons for judgment, the trial court stated that it was "convinced that the parties discussed Ms. Transier's desire to use the second floor in the future based upon the testimony presented, the notation in the plan, and the fact that engineered trusses were used in the construction." The trial court also determined that the "trusses specified in the plans and installed by Barnes were code compliant if the second floor was to be used in the future as a bedroom or attic storage, but not for other purposes." Considering the contradictory and somewhat confusing

---

[5] PSF stands for pounds per square foot.

9

evidence on this issue, we cannot say that the trial court manifestly erred in finding that the floor trusses installed by Barnes were sufficient to support an upstairs bedroom. Thus, the trial court did not err in not including reimbursement to Transier for the materials and labor that she paid to Mr. Howe to upgrade the floor trusses.[6]

## B. *Special Damages*

Transier supported her claim for damages with Plaintiff's Exhibit 16, which included a schedule of the costs she expended curing the defects caused by Barnes' breach of contract, including receipts and invoices for supplies and labor used in repairing her home. In its reasons, the trial court explained how it arrived at the $33,686.15 figure that it awarded Transier for remedying the code violations listed in Mr. Sandifer's inspection report. A perusal of those reasons shows that the trial court went through Transier's receipts with a fine-tooth comb.

Transier claims that the trial court erred in failing to award her the $2,497.10 that Elliott Electric Supply, by certified letter dated September 1, 2010, demanded that she pay on the balance owed by Barnes for fixtures, equipment, and supplies that he used on her home. As Barnes pointed out on appeal, Transier testified at trial that she did not pay the amount owed to Elliot Electric. Accordingly, we find no abuse of discretion in the trial court's finding that Transier failed to prove this item of damages.[7]

---

[6] Transier paid Mr. Howe $2,900.00 in labor and $1,827.19 ($1,691.84 plus 8% tax) in materials.

[7] While Transier claims that the trial court incorrectly believed that Barnes paid the Elliot Electric invoice, the accuracy of that finding is irrelevant as Transier suffered no damages in this regard.

Transier next claims that the trial court made a mathematical error in calculating the amount that she was due as reimbursement for the materials she purchased from Tarver Building Materials. In regard to this item of damages, the reasons for judgment provide:

> Ms. Transier introduced invoices for building materials purchased from Tarver Building Materials for which she sought reimbursement in the amount of $15,927.72. In reviewing the invoices, the Court finds that the following materials were not proven to be related to the remedial work: corrugated paper and tape ($513); sheetrock ($35.80); 3/4 inch plywood ($319.06); cutting blades ($130.32); 3/4 inch sturdi-floor ($1,794); housewrap ($269.97); and floor trusses ($1,691.84). Accordingly, the Court finds that Ms. Transier is entitled to $10,793.41 for materials purchased from Tarvers related to curing the building code violations.

As Transier stated at trial, she had already subtracted the expenses related to the sub-flooring and the corrugated paper and tape in arriving at the $15,927.72 figure. In fact, Barnes notes in his brief to this court that the trial court deducted items from the Tarver's invoices that had already been "pulled out" by Transier.[8] Based on the foregoing, we conclude that the trial court manifestly erred in deducting $1,794.00 and $513.00 from the amount owed to Tarver's. We further conclude that the 8% sales tax that Transier paid on those amounts must be reimbursed to her as well. Accordingly, we increase the amount of damages due Transier by $2,491.56.

---

[8] While Barnes acknowledges the trial court's apparent mistake in this regard, he submits that the trial court improperly awarded Transier $6,811.82 included in the Tarver's invoice for doors. As Barnes did not appeal the trial court judgment or answer Transier's appeal, he is not entitled to any relief on appeal. *See* La.Code Civ.P. art. 2133. Nevertheless, the parties agreed that the door allowance was $7,500.00, more than the amount included in the Tarver invoice. In addition, the trial court found that the project had not reached "blacked in" since the interior had not been "protected from the outside elements." Thus, we find that the door allowance was included in the second draw which Transier had already paid to Barnes as the third draw did not become due under the terms of the contract until "when blacked in."

11

## C.    *Nonpecuniary Damages*

Transier contends that the trial court erred by not awarding her nonpecuniary damages.  Barnes counters that the trial court correctly determined that Transier failed to meet her burden of proving her entitlement to such damages.

Louisiana Civil Code Article 1998, titled "Damages for nonpecuniary loss," provides:

> Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
>
> Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.

"Whether the gratification of some nonpecuniary interest is the principal object of a contract is a question of fact." *Taylor v. Burton*, 97-1348, p. 8 (La.App. 3 Cir. 3/6/98), 708 So.2d 531, 535.  The appellate court in *Matherne v. Barnum*, 11-827, p. 14 (La.App. 1 Cir. 3/19/12), 94 So.3d 782, 791, *writ denied,* 12-0865 (La. 6/1/12), 90 So.3d 442, applied the manifest error standard of review when determining whether the trial court erred in finding that the homeowners "suffered a non-pecuniary loss as a result of [the contractor's] breach of the construction contract and that [the contractor] should have known that his defective workmanship would cause that kind of loss to the [homeowners]." *See also Mayerhofer*, 597 So.2d at 151.

In rejecting Transier's claim for nonpecuniary damages, the trial court cited *Elston v. Valley Electric Membership Corp.*, 381 So.2d 554, 556 (La.App. 2 Cir.

12

1980),[9] which held that "[t]he usual worry over the consequences of property damage (where a plaintiff suffers no direct mental injury from the negligent act) will not justify an award for mental anguish damages." Here, the trial court simply found that Transier failed to prove the existence and extent of mental distress that she allegedly suffered as a result of Barnes' breach of the contract to build her home.

Given the facts of this case and our affirmation of the trial court's finding that both Transier and Barnes breached the obligations that they owed each other under the construction contract, we cannot say that the trial court manifestly erred in making the factual determination that Transier failed to prove her entitlement to nonpecuniary damages in this matter.

### D. *Transier's Amended Damages Award*

Based on the foregoing, we increase Transier's damage award to a total of $36,177.71.[10]

## II. Barnes' Reconventional Demand

Louisiana Civil Code Article 2765 provides that the owner "has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the [contractor] for the expense and labor already incurred, and such damages as the nature of the case may require." In *Bramlette v. Hebert*,

---

[9] In *Elston*, the second circuit upheld the trial court's award of $5,000.00 in nonpecuniary damages to Mrs. Elston, whose psychiatrist testified that she suffered from severe nightmares that intensified after the defendant's negligent replacement of her home's electrical transformer, which caused an electrical surge that destroyed the electrical appliances, light fixtures, and outlets. On the other hand, the appellate court affirmed the trial court's rejection of Mr. Elston's claim for nonpecuniary damages where he failed to prove that he suffered from "a real mental injury." *Elston*, 381 So.2d at 556.

[10] To arrive at this figure, we increased the trial court's $33,686.15 damage award to Transier by $2,491.56, the amount that the trial court erroneously excluded from her claimed damages.

13

210 So.2d 361, 363 (La.App. 3 Cir. 1968), this court found that Article 2765 "is concerned with a situation where the proprietor desires to cancel a construction contract before the work is substantially completed." Where there has been substantial compliance with the construction contract but the work is defective, the courts have applied La.Civ.Code art. 2769 and allowed the builder to "recover the contract price less whatever damages the owner may prove attributable to the breach of contract." *Bramlette*, 210 So.2d at 363.

> Determination of substantial performance is a question of fact about whether the construction is fit for its intended purpose despite deficiencies. Factors that may be considered in determining whether the contractor achieved substantial performance include the extent of the defects or non-performance, the degree to which the purpose of the contract has been impaired, the ease of correction, and the use or benefit to the owner of the work performed.

*Cascio v. Carpet*, 42,653, pp. 10-11 (La.App. 2 Cir. 10/24/07), 968 So.2d 844, 851 (citation omitted).

Transier contends that the trial court erred in finding that Barnes met his burden of proof on his reconventional demand. More specifically, she contends that the trial court erred in its determination that she breached the construction contract. In addition, Transier contends that the trial court erred in calculating the damages that she owed Barnes as a result of her breach, in that the only evidence that he presented at trial was his own self-serving testimony which was uncorroborated by receipts documenting what he spent in materials and labor on the project. Barnes counters that the evidence supports the trial court's finding that "Transier's insistence on Pella windows, doors in excess of allowances, thicker insulation, and a specific ridge cap, combined with her refusal to sign change orders related to those products constituted a breach of her obligation to approve change orders and pay accordingly." Barnes submits that he was entitled to the

14

amount requested in his July 23, 2010 letter to Transier[11] because, as found by the trial court, he was prevented from reaching "blacked in" "partially due to Ms. Transier's position regarding the exterior doors and ridgecap."

The construction contract provided that "[a]ny changes from [the] plan or bid/proposal will be addressed with cost estimate and signed change order." At trial, Barnes testified that Transier failed to sign and pay for two change orders dated June 18, 2010, relating to the home's windows and installation.[12] The total amount of the two change orders was $5,319.85. Transier offered no explanation at trial as to why she did not sign the change orders. Given the fact that Barnes presented the change orders to Transier before the problems with the project came into existence, we cannot say that the trial court committed manifest error in finding that Barnes met his burden of proving that Transier breached the obligations she owed him under the contract.[13]

At trial, Transier's expert, Mr. Sandifer, testified that in his opinion, the home was not "blacked in" when he inspected it on July 20, 2010. He stated that at the "blacked in" stage, a home "should have an enclosed, encapsulated environment. And it should be weather tight." According to Mr. Sandifer's definition, all framing, mechanical, electrical, and plumbing rough-in should be completed for "blacked in" to be achieved, and the home should be ready for dry wall installation. Mr. Sandifer further explained that even if Transier's home had otherwise met his definition of "blacked in," the existence of the code violations noted in his report prevented the home from being considered "blacked in."

---

[11] The letter was admitted into evidence as Plaintiff's Exhibit 5.

[12] The change orders were admitted into evidence as Defendant's Exhibits 2 and 3.

[13] Because we have so found, we need not determine whether Transier breached the contract with regard to the exterior doors.

Transier testified that the home was not "in the dry" when Barnes requested the third draw because of the code violations and because the roof was not finished, several of the windows were not hung, and the house was not wrapped. With regard to the exterior doors, Transier stated that she had picked them out at Tarver's and was willing to sign a change order to cover the additional hundred dollar or so cost above the contract's door allowance but Barnes refused to order them.

Barnes' expert, Mr. Gadberry, testified that his definition of "blacked in" means that the home is "weather resistant," but does not require that "electrical, mechanical, and plumbing" be roughed-in. Nevertheless, he opined that Transier's home was not "blacked-in" when he inspected it in early August of 2010. Mr. Gadberry stated that he agreed with most of the code violations found by Mr. Sandifer. Barnes, on the other hand, testified that his definition of "blacked in" meant that there was "[s]heeting on the walls, framed up, studs, and rafters," that the plumbing was roughed-in, that windows and doors were installed, and that the home was covered in house wrap. He stated that it did not require that the metal roof be installed or that electrical be roughed-in. Barnes testified that he was "past the black in stage" when he asked for Transier to pay the third draw on the contract, although he admitted that the doors were not installed, which he attributed to Transier's failure to order them.

In its reasons for judgment, the trial court found that the house "was not 'blacked in' by Mr. Barnes due the existence [of] building code violations which precluded the house from being considered 'blacked in' . . . by any definition, although the Court finds Mr. Gadberry's definition most persuasive." More specifically, the trial court found that "Mr. Barnes was demanding payment for

framed walls and roofing that was not code compliant." With regard to its calculation of damages due to Barnes on his reconventional demand, the trial court's written reasons provide:

> Ms. Transier argues that since Barnes had not completed the black in, under the terms of the contract, he is not entitled to any more money. While the Court agrees that Mr. Barnes had not reached a completed black in, that was partially due to Ms. Transfer's position regarding the exterior doors and ridgecap. Given the mutual breaches by the parties, the Court finds that La.C.C.art. 2765 is the proper measure of Barnes' reconventional demand. For example, if Ms. Transier fired Barnes one day prior to his completion of black in, could she claim he was entitled to no further payment. To allow such would be unjust.

Those reasons further proved that the trial court relied on Barnes' testimony that "he performed work beyond what was normally completed in the black in phase" to determine the amount of damages that Transier owed Barnes. Moreover, the trial court found that Barnes' testimony was supported by Mr. Gadberry's opinion "that the house was approximately 50 – 55% complete at the time of his inspection," and that the remedial work to cure the code violations were "2.5% of the total project." Applying Mr. Gadberry's estimation to the total contract price of $325,940.00,[14] the trial court found that "fifty percent completion would entitle Barnes to $162,970." Since Transier had already paid Barnes $127,840.00 of that amount, the trial court awarded him the remaining balance of $35,130.00.

Based on the testimony and evidence presented at trial, we conclude that the trial court's damage award to Barnes "is clearly wrong based on the evidence, or clearly without evidentiary support." *2 S Sign Co., Inc.*, 139 So.3d at 554. While the trial court concluded that the house was fifty percent "complete," it failed to consider whether Barnes had "achieved substantial performance" of the

---

[14] To arrive at this figure the trial court added the $2,440.00 brick ledge change order to the original contract price of $323,500.00

construction contract. *Cascio*, 968 So.2d at 851. Applying the factors discussed in *Cascio* to the evidence adduced in this matter leads us to the inevitable conclusion that Barnes had not "achieved substantial performance" when he abandoned the project. *Id.* For one, the defects were substantial and encompassed eighteen code violations. In addition, as found by the trial court, the structure was not "blacked in" or weatherproof as the roof was incomplete and leaked, several windows were missing, and none of the exterior doors had been hung. Transier testified that in order to correct the roof problems, a section of the existing roof had to be removed and a forty-five foot beam was lowered into the structure by a crane and then used to properly brace the roof. Transier could not use the structure as a home and the existing structure was vulnerable to the elements. Finally, Barnes' refusal to remedy the code violations after he promised to do so delayed Transier from being able to start remedial work with another carpenter, and she was not able to move into the home until several years after originally planned.

Because the home was not substantially complete when Barnes ceased working under the contract, the proper measure of his damages under La.Civ.Code art. 2765 must be arrived at by calculating "the expense and labor already incurred." "Where, however, legal error interdicts the fact-finding process, the manifest error standard no longer applies. In such instances, if the record is complete, the appellate court is charged to make its own independent de novo review of the record." *Clement v. Citron*, 13-63, p. 4 (La. 6/19/13), 115 So.3d 1260, 1264 (citation omitted). Here, although the trial court stated that La.Civ.Code art. 2765 was "the proper measure of [damages on] Barnes' reconventional demand," we conclude that it committed legal error in not following that articles' dictates of how to calculate those damages. Accordingly,

because the record is complete, we will make a de novo determination of the proper amount of Barnes' damages.

The contract[15] provided that "Payment is to be made in six (6) installments, as follows:

| | | |
|---|---|---|
| 1st payment | $ 62,700.00 | To Start |
| 2nd payment | 62,700.00 | at foundation pour |
| 3rd payment | 62,700.00 | when blacked in |
| 4th payment | 62,700.00 | when cabinets are installed |
| 5th payment | 10,000.00 | upon completion (final payment) |
| Total | $ 323,500.00 | material and labor |

As mentioned previously, Transier made the first two payments before refusing to pay any more because of the code violations that were discovered by Mr. Sandifer in July of 2010. The trial court determined that the house was not "blacked in" under any definition of that term "due to the existence [of] building code violations." Nevertheless, the trial court gave credence to Barnes' insistence that "he performed work beyond what was normally completed in the black in phase." Given the quality of proof that the trial court required of Transier regarding the measure of her damages and the scrutiny with which it examined that proof, we conclude that the trial court abused its discretion in awarding Barnes damages in excess of the amount that he had already been paid under the contract without requiring that he, too, offer receipts to document the "expense and labor already incurred." *See* La.Civ.Code art. 2765. Although Barnes did give estimates of the amounts he spent on labor and materials,[16] he did not provide a single receipt or

---

[15] In *Dufour v. Janin*, 8 La. 147, 149 (1835), the supreme court rejected the discharged contractor's claim that the cancelled contract was the "exclusive standard of the value of the work done." Instead, the court held that the contract was evidence of "the estimate which the parties had themselves made of the work to be done." *Id.*

[16] Barnes testified that he spent the following amounts on Transier's home: $9,800.00 on concrete; $33,000.00 in building materials from Martin Building Materials; $4,000.00-$5,000.00 at Lowe's; $2,400.00 (4000 feet of cement x $.60 per foot) to a cement finisher; $6,100.00 to a

invoice to document his expenses despite having been asked for that information by Transier in her July 26, 2010 correspondence. Using the high end of those estimates, the amount of his claimed expenses total only $61,300.00. Subtracting that amount from the $127,840.00 that Transier had already paid to Barnes leaves a profit balance of $66,540.00, an amount which we find more than adequately compensates him for the damages he incurred as a result of Transier's breach and/or cancellation of the construction contract. Nonetheless, we find that Transier owes Barnes $5,319.85, representing the amount incurred for the change orders regarding the home's windows and insulation. Accordingly, after our de novo review, we award Barnes the amount of $5,319.85 on his reconventional demand.

## III.  Conclusion

As noted above, we have increased Transier's damage award to $36,177.71, and we have reduced Barnes' damage award to $5,319.85. After offsetting those amounts, Transier is entitled to judgment against Barnes in the amount of $30,857.86.

## DECREE

For the foregoing reasons, the trial court's findings are affirmed in part and reversed in part. Thus, the judgment in favor of Barnes Building, LLC and against Sherri Transier is reversed, and judgment is rendered in favor of Sherri Transier and against Barnes Building, LLC in the amount of $30,857.86. Costs of this appeal are assessed against Barnes Building, LLC.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

---

plumber; $2,500.00 in plumbing material; $1,200.00-$1,500.00 for tractor rental; and $800.00-$1,000.00 on sand.